**Ex parte Howard L. WHITE, Jr.**

**3 Div. 278.**

Court of Criminal Appeals of Alabama.

July 16, 1974.

Rehearing Denied July 30, 1974.

378

Jackson & Sikes, Selma, for petitioner.

William J. Baxley, Atty. Gen. and William G. McKnight, Asst. Atty. Gen., for respondent.

DeCARLO, Judge.

This petition was filed by Howard L. White, Jr. on June 3, 1974, the date set for his trial. The petition prayed that the Court of Criminal Appeals grant a writ directing the Honorable Richard P. Emmet, a Judge of the Circuit Court of Montgomery County, to recuse himself from the petitioner's case (State of Alabama v. Howard L. White, Jr., Montgomery Circuit Court case 9461) or to show cause why he should not be so required.

Specifically, the petitioner avers that the said trial judge has a personal interest in the outcome of the petitioner's case within the meaning of Title 13, Section 6, Code of Alabama and/or that the Honorable Richard P. Emmet possesses such bias and prejudice in favor of the State of Alabama, and against the petitioner, that require his removal under the common law.

After the hearing a rule nisi was issued requiring the respondent to show cause why the writ of mandamus should not issue as prayed. The temporary restraining order was continued in effect until final determination of the petition for writ of mandamus.

The response to the rule nisi was argued and submitted to the Court of Criminal Appeals on June 20, 1974.

The issue in this matter is before this Court on the petition, and respondent's demurrer, motion to strike, and answer.

Essentially, the facts show that Howard L. White, Jr., the purchasing agent for the State of Alabama, was indicted on December 17, 1973, by the Montgomery County Grand Jury and charged with three violations of Title 57, Section 109, Code of Alabama.

The indictment[1] alleges that petitioner, as such purchasing agent, accepted "kickbacks" from vendors of goods to the State contrary to law. Specifically, the alleged "kickbacks" were:

1. Free use of an apartment (value in excess of $25.00).

2. Free use of telephone service (value in excess of $25.00).

3. A 20 h. p. Mercury outboard motor (value of $350.00).

Indictments were also returned on December 17, 1973, by the Montgomery County Grand Jury against Ruby Lee Latham, Robert O. Wilson, and V. E. Richey. As evidenced by newspaper articles attached to the petition as exhibits, charges against petitioner and the other indictees have been generally referred to by the news media as the "Highway Department Scandal".

Ruby Latham was convicted on the evening of January 23, 1974, after a jury trial,

---

[1] "THE STATE OF ALABAMA
"MONTGOMERY COUNTY

"Circuit Court of Montgomery County, November Term, A. D. 1973.
"COUNT I: The Grand Jury of said County charge that, before the finding of this indictment,

HOWARD L. WHITE, JR.,
alias HOWARD WHITE,

whose name is to the Grand Jury otherwise unknown, an officer, agent, or person who is empowered or authorized to purchase property or things of value for the State of Alabama, or departments of the State of Alabama, to-wit: Purchasing Agent for the State of Alabama, Department of Finance, Division of Purchases and Stores, did ask for, bargain for, demand, agree to take, receive, or take from Robert Stapp, or Ruby Lee Latham, or Machinery and Supplies, Inc., a corporation, a seller of such property, a rebate, return, compensation, discount, drawback, or other thing of value, to-wit: free use of, or the right to live in, an apartment in, to-wit: Capitol Towers Apartment Building, Montgomery, Alabama, from, to-wit: October, 1971, through September, 1972, a better description of which, and the exact aggregate value of which, is to the Grand Jury unknown, said aggregate value being in excess of $25.00, contrary to law;
"COUNT II: The Grand Jury of said County further charge that, before the finding of this indictment, HOWARD L. WHITE, JR., alias HOWARD WHITE, whose name is to the Grand Jury otherwise unknown, an officer, agent, or person who is empowered or authorized to purchase property or things of value for the State of Alabama, or departments of the State of Alabama, to-wit: Purchasing Agent for the State of Alabama, Department of Finance, Division of Purchases and Stores, did ask for, bargain for, demand, agree to take, receive, or take from Robert Stapp or Ruby Lee Latham, or Machinery and Supplies, Inc., a corporation, a seller of such property, a rebate, return, compensation discount, drawback, or other thing of value, to-wit: free telephone service or telephone provided in an apartment in, to-wit: Capitol Towers Apartment Building, Montgomery, Alabama, from, to-wit: October, 1971, through September, 1972, a better description of which and the exact aggregate value of which is to the Grand Jury unknown, said aggregate value being in escess (sic) of $25.00, contrary to law;
"COUNT III: The Grand Jury of said County further charge that, before the finding of this indictment, HOWARD L. WHITE JR., alias HOWARD WHITE, whose name is to the Grand Jury otherwise unknown, an officer, agent, or person who is empowered or authorized to purchase property or things of value for the State of Alabama, or departments of the State of Alabama, to-wit: Purchasing Agent for the State of Alabama, Department of Finance, Division of Purchases and Stores, did ask for, bargain for, demand, agree to take, receive or take from Robert Stapp, or Ruby Lee Latham, or Machinery and Supplies, Inc., a corporation, a seller of such property, a rebate, return, compensation, discount, drawback, or other thing of value, to-wit: a twenty horse power Mercury outboard motor, of the value of, to-wit: $350.00, a better description of which is to the Grand Jury unknown, against the peace and dignity of the State of Alabama.
/s/ James H. Evans
"District Attorney, Fifteenth Judicial Circuit of Alabama."

and, although on bond, she was ordered to jail to await sentencing the next morning. The sentencing was again postponed to await a pre-sentence report by the Probation Officer. On January 29, 1974, after the Court of Criminal Appeals ordered her released on appeal bond, she was sentenced, and then released from custody on January 30, 1974.

Petitioner filed a motion of recusal against the respondent on February 19, 1974. Two days later it was heard and subsequently denied by the respondent.

On March 5, 1974, petitioner's counsel learned that charges were filed against respondent by the Judicial Inquiry Commission, and pursuant to Section 6.19 of the Judicial Article (now Title 1 Section 158, Article 6, Alabama Constitution, 1901 as last amended), he was disqualified to act until the Court of Judiciary heard the complaint and rendered a decision.

The complaint stated that while the respondent was acting in his judicial capacity, he wrote a letter and caused it to be delivered to the Judges of the Court of Criminal Appeals, and that such act constituted misconduct. The letter in its entirety reads:

"December 17, 1973

"Gentlemen:

"I am contacting each of you in this extraordinary and confidential manner concerning several indictments recently handed down in this circuit against Ruby Latham, Robert O. Wilson and Howard White.

"I have set high bonds for the following reasons:

"1. Relative to Ruby Latham, I have received two anonymous telephone calls that she plans to flee if indictments are returned against her and that she has been given a significant financial inducement to flee.

"2. Both the Attorney General and the District Attorney of this circuit are of the opinion (which opinion I share) that these persons can give convincing evidence which goes to the very core of a great deal of corruption in various governmental departments.

"It is seldom that in matters such as these, the prosecuting authorities ever have the opportunity of getting to the core of corruption.

"Maintaining these high bonds may very well materially assist in getting to the heart of this matter.

"Lowering these bonds will only serve to bolster those at the core and heart of this matter in their continuing to be able to engage in graft and corruption with impunity.

"I hope each of you can view these cases in this same light and should you be called upon to review these bonds that you will maintain them at the same level.

"Sincerely,
/s/ Richard P. Emmet
"Richard P. Emmet

"RPE/lb"

Subsequently, the Court of the Judiciary met and found that the respondent's unauthorized, ex parte, confidential communication to the Court of Criminal Appeals was improper, and that such action did constitute misconduct in office. "The Court, therefore, expresses disapproval of the conduct of the respondent judge, which conduct this Court condemns as being improper." That matter is now pending before the Alabama Supreme Court for review.

Judge David W. Crosland, Presiding Judge of Montgomery County Circuit Court's Criminal Division, continued the petitioner's case until June 3, 1974. On that date, after the jury was impaneled, Judge Crosland, over the objections of petitioner, referred the case to Judge Emmet for trial.

We now turn our consideration to whether the facts supporting the petition show such bias or prejudice on the part of respondent to warrant disqualification.

Petitioner contends that the first evidence of bias or prejudice exhibited was the excessive bond of $50,000 set in petitioner's case.

Mrs. Pauline C. Eubanks, the Circuit Clerk, testified at the hearing on the motion to recuse on February 21, 1974, that the order fixing bail had been signed by Judge Emmet. She further stated she had looked at all the indictments involving Ruby Latham, Robert Wilson, and the petitioner, and all of them bore his personal signature rather than a stamp.

During the same hearing, Michael H. Capps, an investigator for the law firm of Jackson and Sikes, Selma, Alabama, attorneys for petitioner, testified that he had researched more than a thousand criminal indictments of closed cases in Montgomery County for the past year. His testimony reflected these findings:

| OFFENSE | NO. OF INDICTMENTS | RANGE OF BOND |
|---|---|---|
| Buying, receiving and concealing stolen property | 24 | $500 – $2,000 |
| Grand Larceny | 246 | 500 – 5,000 |
| False Pretense | 71 | 300 – 2,500 |
| "        " | 2 (unsigned) | each    5,000 |
| Murder | 3 | 1,200 – 5,000 |
| Assault to murder | 32 | 300 – 10,000 |
| Indecent Exposure | 4 | 750 – 4,000 |
| Assault with attempt to ravish | 2 | each 7,500 |
| Kidnapping | 4 | each  10,000 |
| Drug violation (marijuana) | 43 | highest  10,000 |
| Drug violation (LSD, heroin, etc.) | 11 | 1,000 – 3,000 |
| Selling LSD | 1 | 1,000 |

Of the indictments checked, $30,000.00 was the highest bond, and this involved child molestation. All the indictments reviewed were stamped with the respondent's name in fixing the amount of bond, with the exception of those dealing with Wilson, Latham, and White, and these were signed in respondent's own handwriting. Further, he stated his examination of Ruby Latham's twenty-three indictments showed each carried bail of $5,000.00. The indictments involving Sarah Gross revealed only six bonds of $1,000.00 each, and, according to George Jones, Register of the Circuit Court of Montgomery County, she had been charged with embezzling $103,180.39 from the State of Alabama.

W. D. Smiley, Chief Deputy Sheriff of Montgomery County, testified that he had been warned by Judge Emmet to be careful with the bonds of Latham, Wilson and White and make sure they were good.

Petitioner refers to the allegations against him as being inextricably intertwined with those against Ruby Latham. Counsel points out that petitioner is charged with accepting "kickbacks" as State Purchasing Agent from Ruby Latham or the corporation of which she was secretary or treasurer. At the same time, Miss Latham is charged with using said corporation to defraud the State through an artifice whereby the State would pay

for items allegedly purchased, but never delivered.

Counsel claims these allegations make the petitioner and Ruby Latham co-defendants in the scheme, and that conduct directed toward Ruby Latham by respondent subsequent to her first conviction on January 23, 1974, supports his allegations of bias and prejudice.

After sentencing, she requested to be allowed to remain free on an existing bond which was denied by the respondent. At a hearing the following morning, Judge Emmet stated:

"THE COURT: The Defendant, Ruby Lee Latham, will come forward.

"Miss Latham, I am not going to pronounce sentence on you as of today. However, I am going to give you an indication at the present time what the Court's sentence will be. I am indicating to you at this time that the sentence of the Court will be ten years confinement in the penitentiary.

"However, I am going to order a presentence investigation conducted in your behalf. I am asking our Chief Probation Officer, Mr. Fred Shook, to conduct a pre-sentence investigation. Mr. Shook is experienced in investigative work. He served—retired as a Colonel from the U.S. Air Force as a special investigator. Incidentally, he was a professional football player prior to that time. He has been instructed to conduct this report as quickly as possible. It will take him some time to familarize himself with the background of the case. He will do that through consulting with the Probation authorities, as he always does. He will also be delighted to consult with your attorneys.

"One thing that I require and one that Mr. Shook requires, is an interview and conference with the Defendant. And we absolutely require that there be total, complete, absolute, full disclosure and cooperation in those matters. I am sure that Mr. Shook, with his experience, will require all of those matters.

"Now, this pre-sentence report will be utilized by me for two reasons. First, I will utilize this to determine whether or not I will reduce my initial indication of sentencing you to ten years imprisonment in the penitentiary, and the second reason that I need this pre-sentence report is to determine whether or not I would consider you eligible and worthy of receiving a suspended sentence and being placed on probation.

"I am sure it will take a few days to conduct this report. During those few days you will be—you will remain in Montgomery County Jail.

"Mr. Shook, when you can get the report you will notify me. Hopefully in the next few days.

"Return the Defendant to jail."

On January 29, 1974, Paul Lowery, Miss Latham's attorney, obtained the following ex parte order from the Court of Criminal Appeals:

"3rd Div. 253

"Ex parte:

"Ruby Lee Latham

"ORDER

"IT IS ORDERED, pursuant to a petition filed in this Court and of which the Attorney General of Alabama had notice, that the petitioner be admitted to bail in the sum of Five Thousand Dollars ($5,000.00) in case No. 9434, Montgomery Circuit Court, said bond to be approved by the Sheriff of Montgomery County, Alabama, as provided by law."

See Title 15, Section 194, Code of Alabama, 1940.

A copy of this order was delivered to respondent and the sheriff.

Later that afternoon, Miss Latham was sentenced by the respondent to ten years without any apparent consideration of the pre-sentence report he had requested from Mr. Shook.

During the recusal hearing, Mr. Shook testified in this manner concerning the pre-sentence investigation of Miss Latham:

(On Direct Examination by Mr. Stanley Sikes)

"Q . . . Did you conduct the report as instructed by the Judge?

"A Yes, I did.

"Q How many times was it necessary for you to interview Miss Latham?

"A Twice.

"Q On how many different days?

"A On consecutive days.

"Q Did you commence your work shortly after receiving Judge Emmet's instructions?

"A Did I what?

"Q Did you commence your work shortly thereafter?

"A Yes, I did.

"Q So you would have interviewed Miss Latham sometime during the day of the 24th and again on the 25th?

"A No, it was—I believe it was the following—after the weekend. I don't recall the dates but it was four or five days—five or six days before I interviewed her, I believe.

"Q Did you assign one of your other probation officers to the case or did you handle this one personally?

"A I handled this one personally.

"Q If I understand, your testimony is then it was some five or six days as

best you can recall. Now, I realize you have a big workload.

"A Right.

"Q But four or five days, as best you can recall, before you went upstairs to interview Miss Latham?

"A Yes, sir. And due to a weekend in there also.

"Q And your office is on the first floor in this building and Miss Latham was in jail on the fourth floor?

"A Right.

"Q Now, sir, I want to direct your attention to the late afternoon on January the 29th. Did you receive a call from Judge Emmet relative to your report?

"A I did.

"Q Can you relate the substance of that call?

"A The Judge informed me that they were having a hearing on sentencing again for Miss Latham, and that any part of my report—he was aware, I am sure he was aware due to the time element that it was not in typed form and there were a few minor leads out, and I brought my rough draft and my notes to the Judge.

"Q If I understand, the substance of your testimony is that the Judge told you to bring the report on, in effect, whether it was finished or not?

"A Right.

"Q Can you recall about what time you got this call?

"A It seems to me it was around four o'clock, maybe a little earlier or a little later.

"Q And you immediately brought the unfinished report and the handwritten report, it hadn't even been typed up, to Judge Emmet?

"A Yes, sir.

"Q And sentencing took place immediately thereafter?

"A A short time thereafter.

"Q Did Judge Emmett ask you anything about the report?

"A Not at that time.

"Q Okay, sir. I don't believe that it is the policy in your office to make recommendations?

"A Not normally, unless the Judge asks for one.

"Q Did the Judge ask for a recommendation in Miss Latham's case?

"A No, sir.

"Q And you, of course, following normal procedures when not asked for a recommendation, you did not make a recommendation?

"A That is right."

Following the sentencing, Judge Emmet made this bench note and order:

"In light of the order of the Court of Criminal Appeals and ex parte, Ruby Lee Latham, dated January 29, 1974, and this Court is unable to determine what amount of bond is to be fixed on appeal and is also unable to determine by whom the bond is to be approved, therefore, this Court hereby orders that the Defendant be held in custody pending direction from the Court of Criminal Appeals."

Judge Emmet explained that he didn't believe the law required an appeal bond be approved by the sheriff. It was his understanding that the bond should be approved by the Circuit Clerk.

Counsel for Miss Latham asked if he would be willing to accept a bond approved by the sheriff *and* the clerk. Judge Emmet replied he would not. It was his belief that the case had gotten confused, and he would rather hear from the Court of Criminal Appeals.

On the following day, the Court of Criminal Appeals issued an order requiring Judge Emmet to immediately admit Miss Latham to bail in the amount of $5,000.00, or appear instanter and show cause why he should not be held in contempt.

At the same time, a separate order was delivered to the sheriff, directing her release or to appear and show cause why he should not be held in contempt. The sheriff immediately released her from jail.

It was the testimony of Mrs. Susan Philpott at the recusal hearing that she was present at the show-cause hearing the next day, and Judge Emmet told the Appellate Court that Miss Latham remained in jail the extra night by agreement of the parties. When Judge Emmet appeared before this court in response to a show-cause order, he told this court that counsel for Miss Latham agreed for her to stay in jail overnight.

Paul Lowery, one of the attorneys for Miss Latham, subsequently testified there was no such agreement, and that he would never consent to leave his client in jail one hour if he had a choice.

Upon receiving the final report of the Montgomery County Grand Jury on February 1, 1974, Judge Emmet expressed these sentiments to the members of the jury:

"I am delighted that the Press is here, because something needs to be said in defense of a judicial philosophy which I espouse very keenly, and it is this:

"Judges should be fearless in looking into the political graft, the political corruption and the political favoritism which is rampant in this Country on the federal level, the state level and the local

level. I for one, as long as I sit upon this bench or any other bench which I might someday sit upon, will continue to vigorously pursue the truth and the complete truth in any case that is presented before me. So I want to make it abundantly clear that I in no way have ever apologized nor will I ever in the future apologize for vigorously pursuing the truth and trying to ferret out the slime that involves itself with political corruption and uses favoritism to erode the confidence of people in Government.

"We are in a grave time in this Country and we need more people like yourselves, who have been willing to give. I would like to commend you, but at the same time I would like to say this publicly. We have a District Attorney and an Attorney General of the State of Alabama who, without fear or favoritism, are willing to pursue this, or any other matter. And I think this is a healthy thing for the State of Alabama. So, I want to commend them.

"I see a gentleman seated in the back— And someone called to my attention the cartoon that was in this morning's paper, and what this cartoon is saying is what the people of the State of Alabama are saying to the people who occupy positions such as I occupy and to people who fulfill duties and responsibilities of citizenship, which is, 'Keep trying'.

"Well, as long as I am here and as long as I am a participant in the judicial process, I don't care how much pressure and how much official threat is brought to bear I shall continue to try to ferret out every single rat-hole of corruption and favoritism and dishonesty and lying and cheating and stealing which is a part of the process. And what I will be doing is I will be making—and you have in effect helped me—just a small contribution, because no single individual can in this complex world today make anything but a small contribution, but nonetheless it is a contribution, of seeing to it

that a Government of the people and by the people and for the people shall not perish from this earth."

Petitioner directs our attention to a portion of the transcript from Miss Latham's second trial and claims that the context of Judge Emmet's statements show he had lost the impartiality required of a Circuit Judge sitting in a criminal case. Counsel insists that the respondent assumed the position of a prosecutor when he made these statements:

"THE COURT: I have previously discussed the circumstances of these matters with you, Miss Latham, and those comments which have heretofore been made concerning another conviction are applicable to this conviction. If you are inclined at some future date to discuss this matter with the authorities, and if you are inclined to make a complete and total and accurate accounting of the disposition of this considerable sum of money, you need only contact me and I will see to it that you are put in touch with the proper authorities. I want to remind you that if this case is on appeal, as long as the motion for appeal is before, me, this Court has and retains jurisdiction to alter the sentence which will, in just a moment, be imposed on you.

"Now, having nothing further to say, do you have anything further to say?

"THE DEFENDANT: No, Your Honor.

"THE COURT: I hereby sentence you to ten years imprisonment in the penitentiary."

I

In the English-speaking countries of the world there exists a well-recognized principle of law that every individual charged with the commission of a crime or misdemeanor shall, upon being charged and made to answer, be accorded a fair and impartial trial.

This rule is basic in the Constitution of our United States and is also found in Article 1, Section 6, of the Alabama Constitution, 1901.

Courts of last resort throughout the United States, over and over, have given emphasis to the importance of observing this principle as the surest means to guarantee fair and just enforcement of the law.

On this subject, State v. Aldridge, 212 Ala. 660, 103 So. 835, quoted approvingly this language from Moses v. Julian, 45 N. H. 52, 54, 84 Am.Dec. 118:

" 'It is the right of every citizen to be tried by judges as impartial as the lot of humanity will admit.' This is but the expression of a well-known rule of universal justice everywhere recognized * * *. It is one of the great principles of the common law, for which the people of England had struggled for ages, and which they ultimately succeeded in establishing against the strenuous efforts of a tyrannical government. We can have no higher authority than this for denouncing as illegal everything which interferes with the entire impartiality of every legal tribunal."

The Supreme Court of the United States has many times in the history of our country written pronouncements concerning the requirements of due process and in the recent case of In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942, it concluded that a fair trial in a fair tribunal is a basic due process requirement. Further, the court stated:

"Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that 'Every procedure which would offer a possible temptation to the average man as a judge * * * not to hold the balance nice, clear, and true between the State and the accused denies the latter due process of law.' Tumey v. State of Ohio, 273 U.S. 510, 532, 47 S. Ct. 437, 444, 71 L.Ed. 749. Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way 'justice must satisfy the appearance of justice.' Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11."

Implanted in the foundation of public policy is the general rule that no judge shall preside in a case in which he is not wholly free, disinterested, and independent. Tumey v. Ohio, 273 U.S. 510, 47 S. Ct. 437, 71 L.Ed. 749.

The Alabama statute governing grounds for disqualification provides:

"No judge of any court, county commissioner, or justice, must sit in any cause or proceeding in which he is interested, or related to either party within the fourth degree of consanguinity or affinity, or in which he has been of counsel, or in which is called in question the validity of any judgment or judicial proceeding in which he was of counsel, or the validity or construction of any instrument or paper prepared or signed by him as counsel or attorney, without the consent of the parties entered of record, or put in writing, if the court is not of record." Title 13, § 6, Code of Alabama, 1940.

The question of disqualification is not to be determined by the terms of the statute alone. There are other grounds than those mentioned in the statute which go to the disqualification of a Judge. In Medlin v.

Taylor, 101 Ala. 239, 13 So. 310, we find this language:

"It is, the opinion of the court, however, that under the doctrines of the common law, aside from our constitutional and statutory provisions, he had such a personal interest in the questions involved in the contestation of Medlin, in the nature of things,—such a bias in favor of one of the parties to the case,—as disqualified him to hear and determine the same, and justified his action in declining so to do. Gill v. State, 61 Ala. 169, and authorities there cited."

Our Supreme Court reiterated this principle in Ex parte Cornwell, 144 Ala. 497, 39 So. 354:

"In Gill v. State, 61 Ala. 172, it was said, 'According to the stern morality of the common law, a judge is required to be legally indifferent between the parties.' In Freeman on Judgments, § 145, it is said to be 'well settled by the common law that no judge ought to act where, from interest or any other cause, he is supposed to be partial to one of the suitors.' Any interest, the probable and natural tendency of which is to create a bias in the mind of the judge for or against a party to the suit, is sufficient to disqualify."

Generally, bias and prejudice are the reasons for seeking a judge's disqualification. Black's Law Dictionary, Revised Fourth Edition, defines bias as:

"Inclination; bent; prepossession; a preconceived opinion; a predisposition to decide a cause or an issue in a certain way, which does not leave the mind perfectly open to conviction. (citations ommitted) To incline to one side. (citation omitted) Condition of mind, which sways judgment and renders judge unable to exercise his functions impartially in particular case."

Prejudice is defined by Black's as:

"A forejudgment; bias; preconceived opinion. A leaning towards one side of a cause for some reason other than a conviction of its justice."

■■ The words bias and prejudice as used above refer to the mental attitude or disposition of the judge toward the petitioner, and not to any views he may entertain respecting the crime with which the petitioner is charged. It is evident a judge's abhorrence of crime will not be held to disqualify him nor will he be disqualified for holding an unexpressed opinion as to innocence or guilt of one on trial before him. Strand Amusement Co. v. Commonwealth, 241 Ky. 48, 43 S.W.2d 321.

The bias or prejudice which will disqualify must be "personal" as distinguished from "judicial" bias. "Personal", as contrasted with "judicial", characterizes an attitude of extra-judicial origin, derived non coram judice. Craven v. United States, 1 Cir., 22 F.2d 605.

The State, representing respondent, contends the issue in this proceeding is whether a trial judge can publicly condemn crime and corruption. His reference is to the judge's remarks before the Grand Jury on the day of their final report. The State contends that a trial judge may vigorously speak out against the commission of crime without being disqualified. Counsel for the State cites in support of his argument, State ex rel. Sagonias v. Bird, 67 So.2d 678 (Fla.), and mades these comments in his brief:

"In the *Bird* case (supra) there was dispute between a Florida trial judge and an appellate court where the trial judge had specifically critized in the press a ruling of the appellate court. On petition for recusal by the defendants, the appellate court, while stating that it did not express 'approval of the propriety of the remarks', did acknowledge *that the same Constitutions which protected the defendants also gave the Judge freedom of speech and expression to oppose matters vigorously and, likewise, found the Judge was not biased."

Although Judge Bird was not disqualified, the Florida Court was constrained to remark:

"While we hold, then, that the disqualification of the respondent has not been made to appear, we feel that we should make it clear that this judgment is not to be interpreted as an expression of approval of the propriety of remarks alleged to have been made, whether such remarks emanate from members of the Bar, or members of the Circuit Bench—who, after all, are lawyers who have been elevated by the people to judgeships. For the Code of Ethics governing the conduct of judges and attorneys, alike, as adopted by this court in 1941, Vol. 31, F.S.A., inhibits them in the free expression of opinion which one not an officer of the court may rightfully engage in."

It should be noted that our court in no way condemns the philosophy expressed by respondent on the occasion in question. On the contrary, we believe it is shared not only by those occupying judicial positions, but by the average man on the street. Judges, however, are not charged with the duty "to ferret out the slime that involves itself with political corruption and uses favoritism to erode the confidence of people in Government." This responsibility rests with the prosecutor.

At this point, we now stop to consider all the grounds upon which the petition is based.

The allegations are: setting of excessive bond; respondent's comments following each Latham conviction; respondent's failure to comply with the order of the Court of Criminal Appeals; respondent's failure to consider the pre-sentence report of the Probation Officer; and respondent's remarks to the Grand Jury.

As his final insistence of bias, petitioner points to the letter from respondent to the Judges of the Alabama Court of Criminal Appeals. He maintains that the entire substance of the letter indicates respondent's prejudgment of the guilt of petitioners, Ruby Latham, and Robert Wilson, and its purpose was to maintain their high bonds.

It is essential before we make our examination of the letter that we take careful note of the following facts:

First, during oral argument on this matter before us, the State's attorneys admitted in open court that the letter was shown to them, and they knew of its contents before it was sent. It was not, however, shown to defendants or their attorneys, and, counsel for petitioner did not learn of its existence until March 5, 1974, two and a half months later. Second, there is the matter of the Writ of Mandamus of Ruby Latham during her second trial, seeking the recusal of the same respondent. At the hearing on the Latham Petition for Writ of Mandamus, this court had knowledge of the letter, but the case was not before this court on a complete record or its merits. As a matter of fact, the case was still at the trial level, but had been completed and submitted to the jury for their determination. This court ruled that the Writ should be denied, but stated the decision was not rendered on mootness. The petition sought on behalf of Miss Latham was not timely, having been presented after the judge had apparently completed all judicial action. State ex rel. Burns v. Phillips, 250 Ala. 120, 33 So.2d 239. Further, the grounds for disqualification were known prior to the trial, although the motion was filed after issue had been joined. Shell v. Shell, 48 Ala.App. 668, 267 So.2d 461.

Due to the pendency of Ruby Lee Latham's appeal, any further discussion of this issue would be unwarranted.

At the outset, the letter indicates it is being written in a confidential manner. The only parties involved besides the State's attorneys and the judge were the defendants and their attorneys. *Thus, it would appear that everyone, except the defendants and their attorneys, was to be privy to the letter.*

The American Bar Association Standards for Criminal Justice, Approved Draft, 1972, relating to The Function of the Trial Judge, § 1.6, provides:

"Duty to prevent ex parte discussions of a pending case.

"The trial judge should insist that neither the prosecutor nor the defense counsel nor any other person discuss a pending case with him ex parte, except after adequate notice to all other parties and when authorized by law or in accordance with approved practice."

Canon 3(4) of The Code of Judicial Conduct adopted by the House of Delegates of the American Bar Association on August 16, 1972, states:

"A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, *neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding.* A judge, however, may obtain the advice of a disinterested expert on the law applicable to a proceeding before him if he gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond." (Emphasis supplied)

The Code of Judicial Conduct adopted by the Alabama Circuit Judges Association in November, 1973, suggests the proper guide and reminder for judges, and a declaration of that which the people of Alabama have a right to expect of them.

Canon 3(4) relating to a judge's impartiality directs:

"A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, *neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding.* A judge however, may obtain the advice of a disinterested expert on the law ap-

plicable to a proceeding before him if he gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond." (Emphasis supplied)

It is evident from the ABA Standards, and the Codes of Judicial Conduct adopted by the ABA and the Alabama Circuit Judges, *that ex parte communications are condemned.*

Without question, this letter directly affects all three defendants named therein. It is immaterial whether they were considered individually or as a group—they were named specifically.

The respondent stated he set high bonds relative to Ruby Latham because of information he received in two anonymous telephone calls. This smacks of the air of prejudgment of guilt based not on any legally proved evidence in a court of law, but on anonymous information. It is well established that in all criminal matters a person is innocent until proved guilty beyond a reasonable doubt. Anything less is a denial of due process under every legal tenet existing in this country whether at the federal, state or local level.

Further, the respondent stated that the Attorney General and the District Attorney were of the opinion that these persons could give convincing evidence concerning corruption in the various governmental departments. It is significant that respondent, as judge, shared this opinion.

This letter seems to indicate that the purpose of high bonds was not to insure the presence of Ruby Latham, Robert Wilson, and Howard White, Jr. at trial, *but calculated to force them to talk.* Our system of justice has progressed in this country to the point where coercive and oppressive methods of wrenching statements from those accused of crime are not only frowned on, but are absolutely illegal under the Federal and State Constitutions. It is far worse when these methods are employed by a judge than when applied by

the use of a policeman's billy club in the cell block.

■ It is the obligation of the Attorney General and the District Attorney to expose crime, and in doing so, leave no stone unturned, but it is not the office of a judge whose duty it is to ultimately preside over those matters so unearthed.

The statement of respondent's opinion showed an alignment of the court with the prosecution and against these defendants. Figuratively speaking, it caused the judge to step down from his bench and assume the State Attorney's place at the prosecutor's table.

"Lowering these bonds will only serve to bolster those at the core and heart of this matter in their continuing to be able to engage in graft and corruption with impunity." Here we have a directive to the Court of Criminal Appeals that the three mentioned persons have been prejudged guilty, and, if their bonds are lowered, the implication is clear that the Court of Criminal Appeals would be assisting those involved in illegal corruption to continue their nefarious ways.

Finally, the letter closes with a hope that each judge of the Court of Criminal Appeals will view the cases of the three indictees in the same light as respondent. In essence this says that the appellate judges should also prejudge these defendants. Further, if called upon to review the bonds, this court should maintain them at the level set by respondent. Ultimately, this would mean that this court should not consider the facts, but, in reviewing this matter, be partial on the side of the prosecution.

■ The overwhelming majority of cases we reviewed concerning the question of disqualification on the grounds of bias and prejudice were resolved without the benefit of any physical evidence. In the instant case, however, we have the letter, a substantial piece of hard evidence showing the requisite bias.

The State relies heavily on Ex parte Thompson, 23 Ala.App. 46, 121 So. 429, and submits the decision is on all fours with the case before us. We do not agree.

First, the defendants in Thompson, supra, had been tried and convicted; second, all cases named in the petition had been appealed from the Recorder's Court of the City of Birmingham to the Circuit Court of the Tenth Judicial Circuit; third, these cases were intended by legislative act to be tried by the judge occupying position number eleven in the Circuit; fourth, Judge McElroy was designated as Judge number eleven by virtue of his appointment to the Circuit bench; fifth, the petitioners were bondsmen for the defendants who had been convicted in the Recorder's Court; sixth, the issue was whether the forfeitures would be made final or their excuses for non-appearance accepted. The paramount distinction in these two cases, however, is that *Thompson,* supra, does not contain any concrete evidence of the judge's personal interest as is shown by the letter before us.

In determining whether there existed the bias required for recusation, it is not necessary to consider whether any one of the allegations contained in the petition, and the proof in support thereof, standing alone, warrants disqualification. When considered altogether, their totality and cumulative effect clearly created a situation of bias that could only result in prejudice to the petitioner.

The opportunity of every accused to have an impartial trial is a jealously guarded right, and this principle was considered in the adoption of directives governing conduct of the judiciary.

The ABA Standards, Approved Draft 1972, relating to The Function of the Trial Judge, states at 1:5:

"Duty to maintain impartiality.

"The trial judge should avoid impropriety and the appearance of impropriety in all his activities, and should conduct

himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. He should not allow his family, social or other relationships to influence his judicial conduct or judgment."

The Code of Judicial Conduct adopted by the ABA, 1972, directs in Canon 3, that a judge should perform the duties of his office impartially and diligently. It further states:

"The judicial duties of a judge take precedence over all his other activities. His judicial duties include all the duties of his office prescribed by law. In the performance of these duties, the following standards apply:

"A. ADJUDICATIVE RESPONSIBILITIES.

"(1) A judge should be faithful to the law and maintain professional competence in it. He should be unswayed by partisan interests, public clamor, or fear of criticism."

Canon (3) of the Code of Judicial Conduct of the Alabama Circuit Judges also states a judge should perform the duties of his office impartially and diligently, and adds:

"The judicial duties of a judge take precedence over all his other activities. Before recognizing personal, family or social responsibilities, a judge must devote sufficient time to his judicial duties to assure their proper performance. His judicial duties include all the duties of his office prescribed by law. In the performance of these duties, the following standards apply:

"A. ADJUDICATIVE RESPONSIBILITIES:

"(1) A judge should be faithful to the law and maintain professional competence in it. He should be unswayed by partisan interests, public clamor, or fear of criticism."

We do not take this subject of disqualification lightly. It is a matter of great importance affecting the orderly processes of our judiciary. A grave responsibility has been handed to us, and we are mindful of its implications. At the same time, we are aware of our obligation in preserving judicial impartiality. Every principle of law and canon of judicial conduct in our system of jurisprudence mandates the cold and stern neutrality of an impartial judge. Anything less is a travesty.

Sir Thomas More embodied the principle of judicial impartiality in this eloquent expression:

"If the parties will at my hand call for justice, then were it my father on one side, and the devil on the other, his cause being good, the devil should have right."

The Petition for Writ of Mandamus be and the same is hereby granted.

Peremptory writ awarded.

All the Judges concur.