[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 831 
This is a child custody case. Wambles, the natural mother of the child in question, appeals from the denial of her petition for modification of custody by the Family Court of Montgomery County. Denial of the petition leaves the child in custody of appellee Coppage, who has been adjudicated over Wambles' objection to be the boy's natural father.
We are cognizant that Wambles has filed two cases, one in her own right and one as next friend of the child, in the United States District Court, Middle District of Alabama, Northern Division, Wambles v. Conn, Civ. Action No. 75-233-N; Roe v.Conn, Civ. Action No. 75-232-N. These actions incorporate some of the factual issues raised in the appeal before us now, include all the parties herein, and overlap considerably with this appeal in *Page 832 
the questions raised. Nonetheless, we do have jurisdiction to hear the appeal, Stephens v. Stephens, 253 Ala. 315,45 So.2d 153. We are not aware of any injunction or order from the federal district court which would prevent our hearing this matter. Moreover, this case dealing as it does with custody pursuant to state court order, there is some authority to the effect that our jurisdiction would be exclusive of the district court's, pending exhaustion of state appeals, Prieser v.Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439; Exparte Burrus, 136 U.S. 586, 10 S.Ct. 850, 34 L.Ed. 500. This latter statement is not intended to dispute the jurisdiction of the federal court, which is properly its own authority on jurisdiction, but is set forth to support our retention of jurisdiction over the case.
The background of the case is as follows:
Coppage and Wambles, though unmarried, resided together and enjoyed sexual relations intermittently in Montgomery during a period from 1970 to 1974. During this period the child in question was born.
Coppage, a construction worker, went to Georgia to work. Upon his return to Montgomery he telephoned a complaint to the police department concerning the situation the child was in.
The next day, June 2, 1975, a police officer picked up the child pursuant to a summary order of Judge William F. Thetford under Title 13, Sections 350, et seq., Alabama Code of 1940, and took him to the Montgomery County Shelter Home.
On June 25, 1975, Coppage petitioned for custody of the child alleging unfitness on Wambles' part.
On July 3, 1975 Wambles filed the federal suits alleging that the sole factual basis for Coppage's complaint and the pick-up order was that she, a white woman, was living with a black man, Charlie Washington, at the time. The purport of the federal complaints is that race was a factor in removing the child from Wambles' custody, in violation of the United States Constitution. These suits are now pending.
On July 10, 1975 Judge Thetford held a hearing in the Family Court on Coppage's custody petition. Considerable oral testimony was taken and transcribed. After considering the evidence, the Family Court issued a decree finding that Coppage was the child's natural father; that no common-law marriage existed between Wambles and Coppage; and awarded temporary custody to Coppage. Wambles was awarded reasonable visitation rights. The child was to be kept at the home of Coppage's mother, Mrs. Johnny Keene, in Pike County. Wambles was given leave to file a petition for custody at any later date.
On July 16, 1975 Wambles filed with Family Court a petition to clarify her visitation rights, stating that Mrs. Keene had refused to allow visitation to take place outside her home.
On July 21, 1975 Wambles filed with Family Court a motion for an order requiring blood tests of herself, the child, and Coppage, in order to refute Coppage's paternity.
Also on July 21, 1975 she filed a motion for new trial of the custody proceeding citing the lack of blood tests, attacking the sufficiency of the evidence, and stating that she was no longer living with Washington.
Hearing on these motions was set for August 14. On August 5, Wambles filed with the Family Court a petition for custody of the child, requesting that hearing on this petition also be held August 14. The grounds for this petition was the averment that a substantial change in circumstances had occurred since the original custody award, to wit: Wambles was no longer living with a man to whom she was not married. *Page 833 
All of Wambles' motions and petitions were denied by order of the Family Court on August 14, 1975, except that Wambles was to be given reasonable visitation rights from 2:00 p.m. to 6:00 p.m. Thursdays in Pike County, Alabama.
No appeal was ever taken from the decree of July 10, 1975, or the order of August 14, 1975.
On November 14, 1975 Wambles filed a second petition for custody with the Family Court. The wording of this petition is completely identical to the wording of the petition filed on August 5. It is this second petition which commenced the proceedings involved in this appeal.
In the meantime, Judge John W. Davis, III, had taken office as Family Court Judge, replacing Judge Thetford.
Judge Davis held a hearing on the second petition on December 11, 1975. On December 22, 1975, he issued a decree denying the petition. It is from this order that Wambles appeals.
The evidence which Judge Davis took under submission on December 11 is briefly summarized as follows:
Wambles' attorneys introduced as evidence the complete transcript of the July 10 hearing conducted by Judge Thetford, in order to establish a basis for Judge Thetford's earlier order, and to support Wambles' contention that there has been a significant change of circumstances and Wambles is entitled to the child.
This transcript records the testimony of numerous witnesses called by both Coppage and by Wambles as well as the testimony of the parties themselves. Most of the factual contentions made therein are in dispute. The recorded testimony most damaging to Wambles tended to assert that she kept a filthy apartment at her old address, with bugs and food waste openly apparent; that the child was unkempt and lacked clean clothing; that Wambles had numerous male visitors in to spend the night; that she often had alcohol on her breath; that she once gave a noisy party, concerning which neighbors called the police; that the child was rebellious, and ran away from home; that the child hid under the house several times, on one occasion requiring Fire Department assistance to retrieve him; that Wambles left the child with a neighbor at night, often calling for the child after midnight; that the child often ate meals at a neighbor's table, and seemed to be hungry.
There is also testimony recorded in the transcript to the effect that several witnesses disapproved of Wambles' association with blacks, and that the presence of a black man or men at the apartment alarmed the neighbors and resulted in Coppage's complaint to police. Other testimony, including that of Coppage, stated that the racial factor played no part in the complaint; that the presence of strange men would be objectionable, white or black; and that, in fact, some of the men spending the night were white. The transcript also contains an instance wherein Coppage's attorney cross-examined Wambles as to the race of her neighbors at her new apartment, Highland Village, and the child's playmates.
The transcript testimony favorable to Wambles asserts that she kept a clean, tidy house; the child was clean, well-clothed and fed, and was taken to the doctor when sick; that there was a good relationship between mother and child evidenced by acts of affection; that no men spent the night except Charlie Washington and Coppage; that Wambles was never intoxicated and did not have loud parties; that Wambles is usually gainfully employed; that she is a fit mother.
The transcript contains testimony consistent to the effect that Coppage supplied financial support for the child. The amount and regularity of the support is in dispute.
In addition to this transcript, the documents before Judge Davis included the reports *Page 834 
of social agencies from Montgomery and Pike County, commenting favorably on both Wambles' and Mrs. Keene's homemaking and relationships with the child. In addition, Wambles introduced affidavits from herself and Mrs. Melissa Blackstone, stating that on July 24, 1975 Mrs. Keene had interfered with Wambles' attempted visitation with the child, rebuking Wambles for "living with niggers." These affidavits had previously been submitted with the motion for new trial and first petition for custody which resulted in the August 14 order clarifying Wambles' visitation privileges.
Oral testimony was taken on December 11, 1975 from Coppage, Wambles and Blackstone.
Wambles testified as to her employment history prior to and after June 2, 1975. As of December 11, she was working in the dietary unit of a nursing home for $75.00 per week. Her hours were 6:00 a.m. to 2:30 p.m. She has applied for food stamps and other public assistance. Wambles' residence is unchanged since July 10, 1975; she resides at the Highland Village apartments, a government-assistance project.
If given custody, Wambles intended to leave the child at the housing authority on-premises day-care center while she worked. The center opens at 7:30 a.m., leaving a gap of ninety minutes in the child's supervision. Wambles testified that she had arranged for Melissa Blackstone to keep the child from 6:00 a.m. to 7:30 a.m.
Wambles testified that no man has slept at her apartment since July. She also testified as to Coppage's and Mrs. Keene's interference with her visitation attempts.
Melissa Blackstone testified that she is a housewife. Her own children are three years and eighteen months old. She became acquainted with Wambles through a friend of Wambles' lawyer. The first meeting between the two occurred just prior to Wambles' trip to visit David at Mrs. Keene's house in July. Since Wambles does not have a car, Blackstone was asked and agreed to drive her to Pike County. Blackstone has visited Wambles at home six or seven times, and has seen her otherwise three or four times a week.
Blackstone stated that Wambles' apartment is clean, and no men are present. There is plenty of food. Blackstone testified that Wambles exercised her visitation rights twenty-five percent of the time.
Blackstone testified that she has agreed to keep the child from 6:00 a.m. until 7:30 a.m. Blackstone will pick the child up in the morning. She testified that she has never been to Highland Village earlier than 8:00 a.m. She is not licensed to operate a day-care facility. She resides at Park Towne, a private apartment complex across town from Highland Village. She did not testify as to whether she would be compensated by Wambles for her services, or whether she was rendering them gratis. Blackstone has never seen the Highland Village day-care center.
Coppage testified that he worked from 7:00 a.m. to 4:00 p.m. at a contracting job. His mother, Mrs. Keene, 54 years old, is present to supervise the child twenty-four hours a day. Coppage stated that the boy had several playmates.
According to Coppage, the only interference with Wambles' visitation rights occurred when, on the advice of attorneys, Mrs. Keene refused to let Wambles take the child away from the Keene house. Coppage stated that Wambles was never prohibited from coming to see the child; that nothing has ever been done to prejudice the child against Wambles; that Coppage has encouraged the child to have a favorable attitude toward Wambles, but the child will not accept it. He further stated that the child has settled into the Keene home, and a radical change in surroundings would upset him. *Page 835 
Wambles' first major contention on appeal is that the trial court's decision to deny the second petition for custody, without a showing that Wambles totally failed to fulfill her parental responsibilities, was plainly and palpably wrong. This contention misstates the applicable law, and thus presents an inadequate ground for reversal; the paramount principle in determining child custody is the welfare of the child, Brill v.Johnson, 293 Ala. 435, 304 So.2d 595, an inquiry in which parental rights are important, but not so absolutely controlling as appellant asserts, Borsdorf v. Mills,49 Ala. App. 658, 275 So.2d 338.
This argument of appellant has two branches: first, that the "tender years doctrine" has been transgressed below, and, second, that there is no evidence of Wambles' unfitness.
The tender years doctrine is a rebuttable presumption that "all things being equal, the mother is better fitted to care for a child of tender years," Bynum v. Bynum, 52 Ala. App. 633,296 So.2d 722. See also, Blankenship v. Blankenship, 248 Ala. 489, 28 So.2d 409; Statham v. Statham, 276 Ala. 675,166 So.2d 403; Ala. Digest, Parent and Child, §§ 2 (3.1) and 2 (3.2).
Appellant cites Griggs v. Barnes, 262 Ala. 357, 78 So.2d 910, for the point that clear and convincing proof of unfitness is required to deprive the natural mother of custody. Clear and convincing proof is not necessarily undisputed proof. The present case presented Judge Davis plentiful, albeit disputed, evidence of Wambles' unfitness, summarized above. Appellant's own exhibit, the July 10 transcript, makes numerous references to appellant's poor housekeeping, late hours, consumption of intoxicating beverages, and inability to prevent the child from running away. Though placed in dispute by other transcript testimony, these references, unless disbelieved, are convincing proof of unfitness. It must be noted, that appellant, who introduced the transcript, offered no new testimony on December 11 to explain or refute the inferences gleaned from that document.
Additionally, the strict proof required in Griggs v. Barnes,supra, is not called for here. Griggs dealt with the right to custody of a natural mother, the sole identifiable blood parent, vis-a-vis the claims of foster parents not related by blood to the child:
 ". . . [T]he courts of this state do not have the power to sever the bonds of blood relationship merely in order to gain some real or fancied advantage for a minor child,"
262 Ala. at 362, 78 So.2d at 914. In the instant case Coppage has been adjudged to be the natural father of the child. This adjudication has not been appealed, and is res judicata. The custody decision faced in this case is the allocation of custody between two natural parents.
In such situations the unfitness of the mother need not be established to rebut the presumption of the tender years doctrine. Rather, the father can obtain custody upon showing that he is relatively more fit, Statham v. Statham, supra. Such a result is a necessary consequence of the natural father's rights to due process and equal protection, Thompson v.Thompson, 57 Ala. App. 57, 326 So.2d 124, cert. den. 295 Ala. ___, 326 So.2d 129. See Stanley v. Illinois, 405 U.S. 645,92 S.Ct. 1208, 31 L.Ed.2d 551. As previously mentioned, the evidence does show Wambles' unfitness; it even more convincingly points to Coppage's comparatively better suitability. His income is larger and steadier; he has financially supported the child in the past; the child is under twenty-four hour adult supervision at the Keene home; there are no reports that the child has run away. *Page 836 
Appellant's contention further neglects the fact that, the petition's caption notwithstanding, this is an action formodification of child custody. The orders of July 10 and August 14 placed custody with Coppage; the petition filed November 14 necessarily sought modification, not an original award of custody. Thus, the burden is on appellant to prove circumstances which justify the court in disturbing the child's custody, Clarke v. Clarke, 47 Ala. App. 558, 258 So.2d 902;Stifflemire v. Williamson, 250 Ala. 409, 34 So.2d 685; it is not appellee's burden to disprove such circumstances. This rule of law is a rule of repose, protecting the child from frequent environmental dislocations, Wood v. Wood, 57 Ala. App. ___,333 So.2d 826, 1976; Statham v. Statham, supra.
In the hearing of December 11, Wambles and Blackstone offered oral testimony that the apartment was clean, no men were living there, appellant was employed, and that there was a day care arrangement of sorts. With such minimal proof of materially changed circumstances — amounting to little more than a statement of good intentions — the trial judge was well within his proper scope of discretion in denying this, the second petition in less than six months. There is no palpable error in Judge Davis' declining to place the child in a situation where its welfare from 6:00 a.m. to 7:30 a.m. daily is entrusted to an unlicensed, possibly unpaid volunteer who must drive across Montgomery, either leaving her own two infants at home alone or taking them with her, to fulfill her obligation. There being no palpable error, there is no ground for reversal, Randolph v.Randolph, 45 Ala. App. 326, 229 So.2d 923.
Wambles, who is white, makes the second contention that she is the victim of racial discrimination by the trial court. She argues that the true reason she has been denied custody is because her paramour, Charlie Washington, was black, she likes to associate with black persons, and she currently resides in a predominantly black apartment complex.
A person does have the right to associate with persons of their choice without regard to race. Racial considerations per se are not relevant judicial considerations. However, the factual basis for this contention as well as our basis for review is not clearcut.
Appellant contends that the trial judge was motivated by an attitude of invidious racial discrimination in issuing the denial of the petition.
Title 13, § 6, Code of Alabama, provides the statutory grounds for disqualification of a judge. The grounds set out in the statute do not exclude common law grounds. The common law required that no judge sit in judgment where, due to extrajudicial causes, he could not be legally indifferent between the parties, Shell v. Shell, 48 Ala. App. 668,267 So.2d 461, cert. den. 289 Ala. 751, 267 So.2d 467.
It is not likely that a racially prejudiced judge could be indifferent in a case involving a party's relations with the racial group that is the object of the prejudice. Upon proper proof, timely presented by motion or petition, that such prejudice exists, the judge should recuse himself. Where the judge refuses to do so, review may be obtained by mandamus or by appeal, Shell v. Shell, supra, and the appellate courts will be diligent in taking remedial action. The powers of supervisory control possessed by appellate courts will be exercised to insure due process and fair play at the trial level, without taint of invidious racial discrimination.
It is a well-established rule in Alabama that a challenge to a judge's qualifications must be presented at trial so that the trial judge can rule thereon, Shell v. Shell, supra. The issue of qualification, not being raised at the trial level, *Page 837 
cannot be raised on appeal, Gross v. Gross, 265 Ala. 58,89 So.2d 737. This legal principle is analogous to the substantially similar rule prevailing in federal practice,Brotherhood of Locomotive Firemen and Enginemen v. Bangor A.R. Co., 127 U.S.App. D.C. 23, 380 F.2d 570, cert. den.389 U.S. 327, 88 S.Ct. 437, 19 L.Ed.2d 560, and serves the same important legitimate purposes of allowing prompt determination of the questions raised, reducing the duplication of trials, and eliminating tactical advantages for obstructive or dilatory parties, Davis v. United States, 411 U.S. 233, 93 S.Ct. 1577,36 L.Ed.2d 216. The rule is applied to all manner of cases; there is no discrimination in applying it here. In fact, it would be a burdensome discrimination against appellee to disregard the rule. Appellant's failure to raise the issue of qualification below precludes consideration of that issue on appeal insofar as it relates to the possibility of recusal of the trial judge. Michel v. Louisiana, 350 U.S. 91,76 S.Ct. 158, 100 L.Ed. 83; Francis v. Henderson, ___ U.S. ___,96 S.Ct. 1708, 48 L.Ed.2d 149, 1976.
Nor does appellant point to error in any specific ruling in the trial judge's conduct of the case. Instead, we are presented with the contention that because in appellant's view no evidence, other than irrelevant evidence regarding racial matters, supports the decree below, racial prejudice must be the overriding factor in the decision.
After carefully reading the entire record and appellant's brief (appellee submitted no brief), we are convinced that appellant has failed to establish the existence of racial bias.
Appellant devotes a portion of her brief to arguing that Judge William F. Thetford allowed racial considerations to enter his decision of July 10, 1975 which originally gave Coppage custody of the child. Judge Thetford did not conduct or preside over the modification proceedings initiated November 14, nor did he enter the resulting order now on appeal. In fact Judge Thetford no longer occupied the office of Family Court Judge at the time the modification proceedings took place. Inclusion of matter challenging Judge Thetford in appellant's brief presents nothing for review. Appellant never perfected an appeal from Judge Thetford's original decree, and cannot now gain review of it through an indirect challenge.
It was Judge John Davis who presided over the trial of the present case; if bias or prejudice is to be proven by appellant, it must be attributed to Judge Davis.
Appellant presents two items allegedly showing that Judge Davis' decree was influenced by racial bias. One such item is Judge Davis' own deposition taken in the aforementioned federal suit. The entire portion of the deposition which was submitted to this court is as follows:
 "Q (Interrupting) What do you mean by `the manner in which the facts were presented to you'?
 "A Well, if someone in whom I had a great deal of trust and faith called me or came to my office and told me that a sordid condition existed, then I would certainly have to give that more weight than Joe Blow coming in and telling me that.
 "Q Who do you mean by someone in whom you have a great deal of trust?
"A I think of no particular person.
 "Q Back to the hypothetical again, a white woman with a child living with a black man, would it influence your decision as to whether to issue a summary pickup order if the couple and the child were living in a predominantly black neighborhood?
 "A I think that would be a factor that would be considered.
 "Q Why would that be a factor that would be considered? *Page 838 
 "A Because notwithstanding our opinions as to whether say fifty-fifty per cent integrated neighorhoods should or should not exist, for the time being there appears to be some evidence that says or indicates that one member of a race or a very small number of members of a race, living in a great, or amongst a great number of members of another race, does present problems.
 "Q What evidence are you talking about that you just referred to?
 "A Well, I can't cite you readings or authorities in sociology, but —
 "Q (Interrupting) But it would be a factor for your consideration that if a child —
 "A (Interrupting) I would not dismiss this from my mind.
 "Q Would you issue a summary pickup order based on the fact that a white woman with a white child was living with a black man in a black neighborhood?
"A Possibly not.
"Q But, again, the possibly yes answer also applies?
"A (Witness nods affirmatively.)
 "Q But the race and the neighborhood is a consideration in your consideration?
 "A Everything, every bit of information I can put my hands on is a consideration. I do not want to exclude anything from my consideration. I feel that. . . ."
This deposition is not part of the record in the case on appeal. Nonetheless, in keeping with the broad spirit of NAACPv. Ala., 377 U.S. 288, 84 S.Ct. 1302, 12 L.Ed.2d 325, we have analyzed it in order to insure that appellant received a fair hearing below.
In the deposition, Judge Davis clearly makes statements reflecting a racially neutral and not a discriminatory attitude. In response to questioning the judge does disclose that he is aware of some evidence that individuals or small groups of one race isolated within an area among a much greater number of another race face special problems. The judge also stated that every bit of information he can lay his hands on goes into his decision to issue a summary pickup order.
Even in the context of this latter statement, Judge Davis indicated that the racial factor would not control his decision to issue a summary pick-up order for a sole white child in an otherwise all black neighborhood. The judge possibly would not or possibly would issue the order.
The deposition thus shows Judge Davis to possess an unbiased attitude toward litigants without regard to their race.
Moreover, the deposition must be considered in light of the difference between the summary proceeding referred to in the deposition, and the adversarial custody proceeding now on appeal. In the former, the judge is faced with the urgent immediate question of whether or not a situation is so imminently dangerous to the child as to require its temporary but immediate removal from its environment, pending further proceedings.
By contrast, the type of hearing from which this appeal is taken is a regular, adversarial court proceeding, without the critical time factor. Nowhere in the deposition is Judge Davis asked how he would respond to similar matters if their introduction as evidence was objected to in court. The deposition thus casts little light on the appellant's major contentions in this appeal.
The second item presented to show alleged prejudice on Judge Davis' part is the transcript of testimony from the July 10 hearing conducted by Judge Thetford. This transcript was introduced at the modification proceeding by Wambles' lawyers as a documentary exhibit. *Page 839 
It is appellant's contention that the transcript contains "rampant racial overtones," and that, because Judge Davis, after reading the transcript, did not modify Judge Thetford's order, Judge Davis is undoubtedly prejudiced.
Having evaluated the transcript carefully for its evidentiary value, we disagree with appellant and affirm the instant decree.
In addition to a great amount of legitimate testimony of unfitness, the transcript does contain quite a few references by counsel for both parties and by witnesses to racial matters. The bulk of these statements occurred on cross-examination and were obviously responsive to questions aimed at revealing the racial attitudes of the witnesses to shake their credibility. The questions were posed in approximately equal numbers by counsel for appellant and counsel for appellee. The responses of the witnesses were correspondingly mixed: about half thought Wambles' relationships detracted from her fitness, about half did not. Witness Fred Mosely put forth some testimony that is quite damaging to Wambles, and his testimony contained no reference whatsoever to race. Several other witnesses for Coppage testified in response to questioning by Wambles' lawyer, to the fact that some of the men observed entering the Wambles' apartment were black, but went on to add that it was the presence of strange men in general, not the color of their skin to which they objected.
After carefully evaluating the transcript we hold that its contents do not indicate that Judge Davis was controlled by any rampant racism found therein. First, the transcript presents a great many racially neutral facts on which to base the conclusion that the detrimental nonracial factors in Wambles' home life have not improved sufficiently to justify modifying the original decree. Second, there is nothing presented by appellant to show that the racial testimony in the transcript appealed to an alleged prejudice possessed by the judge. To the contrary, it is equally, if not more likely, that Judge Davis found that any racially biased remarks made by a witness in the transcript rendered that witness' testimony somewhat less credible. Such a conclusion would indicate that appellant's lawyers achieved the purpose sought when they elicited the testimony with their questions. Third, the transcript does not present such overwhelming evidence that the original decree was so governed by racial prejudice as to cry out for Judge Davis to modify it. Judge Davis was not sitting in review of the original decree; it was not his office to pass judgment on evidentiary rulings made by Judge Thetford. Fourth, the transcript was submitted in unabridged entirety by appellant. Appellant cannot complain of the trial court considering any matter therein. Fifth, it is the rule observed in Alabama and in federal practice that to be reversible, prejudice must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case, United States v. Grinnell Corp.,384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778; Ex parte White,53 Ala. App. 377, 300 So.2d 420, cert. den. 293 Ala. 778,300 So.2d 439. There are no such extrajudicial sources pointed to here, other than the deposition which we have found unpersuasive.
Appellant's showings do not suggest a significant possibility that racial bias infected Judge Davis' conduct of the case or his decree rendered therein. Rather, it appears the decree is soundly based on racially neutral considerations.
There being no reversible error argued, the decree of the trial court is affirmed.
AFFIRMED.
WRIGHT, P.J., and HOLMES, J., concur. *Page 840