314 So.2d 879

**ASSOCIATED INDUSTRIES OF ALABAMA, INC., et al.**

v.

**STATE.**

**3 Div. 316.**

Court of Criminal Appeals of Alabama.

April 8, 1975.

Rehearing Denied May 6, 1975.

Warren H. Goodwyn of Balch, Bingham, Baker, Hawthorne, Williams & Ward, Montgomery, for Associated Industries of Ala., Inc., Gilbert Mobley, Ala. Trucking Ass'n. and James I. Ritchie.

Charles A. Stakely, Jr., and Robert A. Huffaker of Rushton, Stakely, Johnston & Garrett, Montgomery, for Ala. Farm Bureau Federation, Milton Parsons Ala. Textile Manufacturers Ass'n. and Tom Eden.

Harry Cole and William I. Hill, II, of Hill, Hill, Carter, Franco, Cole & Black, Montgomery, for Ala. State Chamber of Commerce.

Richard C. Belser and David B. Byrne, Jr., of Robison, Belser, Brewer & Phelps, Montgomery, for Ala. Forestry Ass'n. and Joe W. Graham.

William J. Baxley, Atty. Gen., and James S. Ward, Asst. Atty. Gen., for the State.

**HARRIS, Judge.**

Five domestic corporations, one domestic association, and five individuals, were indicted by a special grand jury of Montgomery County, Alabama, for violating the state's Corrupt Practices Law. Omitting the formal parts, the two-count indictment reads as follows:

"The Grand Jury of said County charge that, before the finding of this indictment, Associated Industries of Alabama, Inc., a corporation; Alabama Farm Bureau Federation, a corporation; Alabama Trucking Association Inc., a corporation; Alabama Textile Manufacturers Association, Inc., a corporation; Alabama State Chamber of Commerce, a corporation; Alabama Forestry Association, a corporation; Joe W. Graham; James I. Ritchie; Thomas Eden; Gilbert Mobley and Milton Parsons, whose names are otherwise unknown to the Grand Jury, did associate or comprise a political committee in that each of said persons or organizations was elected, appointed, chosen or associated for the purpose wholly or in part of directing the raising, collection or disbursement, or in that each of said persons or organizations cooperated in the raising, collecting or distribution, or in the controlling or directing the raising, collecting or disbursement of money used or to be used in support or in opposition to a measure or proposition submitted to popular vote, to-wit: proposed Alabama Constitutional Amendment No. 1, which was submitted to popular vote in the 1972 general election, and did fail to file within thirty days after the general election held in November of 1972, with the Secretary of State, a statement giving in itemized, detailed form, including names, items and detailed amounts, covering all of the expenditures made directly or indirectly, and all obligations, debts or liabilities assumed or incurred by the committee at the time of filing of said statement, said statement which was further to include the names of all contributors of amounts in excess of ten dollars, with amount given by each, and a list of all gifts, loans and contributions made, such statement which was further to itemize all monies, expended in sums over five dollars giving the names of various persons to whom such moneys were paid, the specific nature of each item, by whom the service was performed, and purpose for which it was expended, such statement which was further to have had an affidavit attached, subscribed and sworn to by the treasurer of said committee setting forth in substance that the statement thus made is in all respects true, and that the same is a full and detailed statement of all moneys, securities or equivalents of money coming under the control or custody of the committee and by them expended directly or indirectly, contrary to law, against the peace and dignity of the State of Alabama.

## "COUNT TWO

"The Grand Jury of said County further charge that, before the finding of this indictment, Associated Industries of Alabama, Inc., a corporation; Alabama Farm Bureau Federation, a corporation; Alabama Trucking Association, Inc., a corporation; Alabama Textile Manufacturers Association, Inc., a corporation; Alabama State Chamber of Commerce, a corporation, Inc., a corporation; Alabama State Chamber of Commerce, a corporation ·(sic); Alabama Forestry Association, a corporation; Joe W. Graham; James I. Ritchie; Thomas Eden; Gilbert Mobley and Milton Parsons, whose names are to the Grand Jury otherwise unknown, did print, publish or circulate printed matter consisting of newspaper advertisements having reference to an election, to-wit; the 1972 General Election in which proposed Alabama Constitutional Amendment No. 1 was submitted to popular vote, which newspaper advertisements did not bear on the face thereof the name and address of the person or committee causing the same to be published, against the peace and dignity of the State of Alabama."

The specific sections of the law involved are Sections 268, 279 and 282, Title 17, Code of Alabama 1940.

Each defendant filed a demurrer, separately and severally to each count of the indictment attacking its sufficiency for failure to set forth the constitutent elements of the alleged offenses. The specific grounds of the demurrer taking the point that the indictments are fatally defective are:

1. The indictment and each count and allegation thereof fail to allege any criminal intent to violate the law on the part of the defendant.

2. The facts stated in the indictment and each count thereof fail to allege any specific intent by the defendant to engage in the unlawful conduct.

3. The indictment and each count thereof fail to allege the defendant willfully failed to file the itemized statement required by law.

4. The indictment and each count thereof do not sufficiently·charge the elements of the crime attempted to be charged and it is impossible for this defendant to prepare a defense thereto.

5. It is not alleged that the defendant willfully committed the acts charged.

All appellants also raised by demurrer that they were being subjected to unconstitutional discriminatory enforcement of the statutes under which they were charged with violating, all in violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States and the Constitution of Alabama.

The same grounds of the demurrer and other matters were raised by all defendants in motions to quash the indictment.

There were numerous other motions and pleas filed on behalf of each defendant but under the view we take of this case, it is unnecessary to treat them separately.

The trial court overruled all demurrers, motions and pleas on November 12, 1973.

We hold the trial court committed reversible error in not sustaining the demurrers to the indictment. The indictment is fatally defective for failure to charge that the acts or omissions were "willfully" done. The penalty statute for violations of the Corrupt Practices Law is Section 332, Title 17, Code of Alabama 1940, and is as follows:

"Corrupt practice in election or primary election.—Any person or persons who do any act defined or declared to be a corrupt practice under the election or primary election laws of this state, *or who wilfully fails or refuses to do any act required of such person under this chapter,* relating to the corrupt practice law

of this state, shall be guilty of a misdemeanor, and, on conviction, must be fined not more than five hundred dollars, and may also be imprisoned in the county jail or sentenced to hard labor for the county for not more than six months at the discretion of the court trying the case." (Emphasis added)

In *Padgett v. State*, 36 Ala.App. 355, 56 So.2d 116, Presiding Judge Carr wrote:

"A 'willful' act may be described as one 'done intentionally, knowingly, and purposely, without justifiable excuse, as distinguished from an act done carelessly, thoughtlessly, heedlessly or inadvertently.' Lobdell Car Wheel Co. v. Subielski, Del., 2 W.W.Harr. 462, 125 A. 462, 464.

"The court held in Grebe v. State, 112 Neb. 715, 201 N.W. 143, that the word corruptly when used in a statute generally imports a wrongful design to acquire some unauthorized advantage.

"In the case of United States v. Edwards, C.C. [Ala.] 43 F. 67, the court held in effect that the word corruptly as used in an indictment for perjury is not synonymous with willfully, since the former means viciously, wickedly, while the latter means with design or with some degree of deliberation.

See also *Dixon v. State*, 40 Ala.App. 465, 115 So.2d 262.

In *Mitchell v. State*, 248 Ala. 169, 27 So.2d 36, it was held that the general rule that an indictment which substantially follows the language of the statute is sufficient is not applicable where the statute does not prescribe with definiteness the constitutent elements of the offense. This case further held that an indictment must allege sufficient facts to show in and of themselves the criminal offense, and a statement of bald conclusions will not suffice, and laxness will not be permitted in charging the commission of a crime.

In construing certain sections of the Corrupt Practices Law, the Supreme Court

in *McCutcheon v. Thomas*, 261 Ala. 688, 75 So.2d 649, said:

"So far as we are aware there is no other penalty for the failure to do either of the aforesaid acts, (Title 17, Sections 279 and 281, Code of 1940) except as set out in § 332, Title 17, Code of 1940, which provides that one who *willfully fails* or refuses to do any act required of such person relating to the corrupt practice law of the state shall be guilty of a misdemeanor." (emphasis supplied)

The Attorney General's office has ruled on this very point. In the Biennial Report of the Attorney General, 1928–1930, Attorney General Charles C. McCall wrote:

" . . . . (T)hat where one willfully fails or refuses to do these things required to be done under said corrupt practice law, that person is guilty of a misdemeanor also and punishable as provided in Section 3937 of the Code, supra. Therefore, where a candidate for party nomination in a primary held under the election laws of Alabama, willfully fails or refuses to file his statement of expenditures as such candidate in the manner and within the time prescribed by law, such candidate . . . . . is also guilty of a misdemeanor under Section 3937, Code of Alabama 1923, supra."

■ Section 3937, referred to in the above opinion, is now Section 332, Title 17, Code of Alabama 1940. This opinion clearly states that a person or organization charged with violating the Corrupt Practices Law must be charged with and proven to have *willfully done or failed* to do the acts defined as corrupt practices. While opinions of the Attorney General are advisory in nature they are, nevertheless, entitled to great weight.

In *Jackson v. State*, 36 Ala.App. 466, 58 So.2d 901, the Court observed:

"It is true that the complaint follows the language of the statute. This is ordinarily sufficient, but such general rule is not applicable where the statute does not

prescribe with definiteness the constituent elements of the offense. Collins v. State, 28 Ala.App. 400, 185 So. 779; Mitchell v. State, 248 Ala. 169, 27 So.2d 36.

"A defendant in a criminal prosecution is guaranteed the right by our constitution and statutes to a formal accusation of the nature of the charge he is to defend. Mitchell v. State, supra. The facts should be stated in such manner as to apprise a person of common understanding of what is intended, and must charge a defendant with sufficient certainty to protect the defendant against jeopardy of a second trial, and permit him to prepare his defense. Stinson v. State, 28 Ala.App. 559, 190 So. 303, certiorari denied 238 Ala. 272, 190 So. 305; McQueen v. State, 31 Ala.App. 101, 13 So.2d 59, certiorari denied 244 Ala. 251, 13 So.2d 61; Grattan v. State, 71 Ala. 344."

█ He whose conduct is defined as criminal is one who "willfully" fails to do any of the acts denounced by the Corrupt Practices Law, and willfulness is an essential and constituent element of the charge in an indictment brought under said law. The indictment failing to so charge renders it fatally defective upon apt demurrer taking the point, as was done in this case, and must fall.

█ By our holding in this case, we do not intend to detract from the general rule, so well recognized, that it is sufficient to charge the elements of a statutory offense in the words of the statute. However, it is well to note that the real contention before us is not that the indictment does not charge an offense, but that the appellants were not apprised of the thing or things that they are alleged to have done in such a way as that they amounted to a crime. To state the matter another way, it may be conceded that appellants are *sufficiently informed* of the crimes with which they are charged, but it by no means follows that they have been sufficiently informed

of the *acts which allegedly constituted those crimes.*

In *Gayden v. State,* 262 Ala. 468, 80 So. 2d 501, the late Mr. Justice Simpson eloquently summed up the requirements for a sufficient indictment as follows:

"Indictments must always conform to the mandates of our organic law. The emphasis in our cases 'that in all criminal prosecutions, the accused has the right * * * to demand the nature and cause of the accusation' now § 6 of the Constitution of 1901—is not meaningless tautology, but one of the cornerstones of our Bill of Rights. As was observed by the late lamented Mr. Justice Brown in Spooney v. State, 217 Ala. 219, 222–223, 115 So. 308, 312;

" ' " * * * It is but an expression of the fundamental principle that inspired civilized man to form a government, the ultimate purpose of which is to protect the individual in working out his destiny, and finds expression in our Constitution in these words: 'That in all criminal prosecutions the accused has a right to be heard by himself and counsel, or either; * * * and he shall not be compelled to give evidence against himself, nor be deprived of life, liberty, or property, except by due process of law.' * * * Constitution of Alabama 1901, §§ 6, 13. * * *

" ' "The manifest purposes of the quoted constitutional provisions, where life, liberty, and property are affected, are to secure the citizen against the *arbitrary action of those in authority*, and to place him under the protection of the law." * * * '

"And that provision and the others of our Bill of Rights 'are to be largely and liberally construed in favor of the citizen.' Dorman v. State, 34 Ala. 216, 238.

"We are further restrained in this case by the requirements of the Fourteenth Amendment to the Constitution of the

United States. The following utterances by our Federal courts are pertinent: 'No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal.' Cole v. State of Arkansas, 333 U.S. 196, 201, 68 S.Ct. 514, 517, 92 L.Ed. 644. 'The petitioner charged that he had been denied any real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process * * *.' Smith v. O'Grady, Warden, 312 U.S. 329, 334, 61 S.Ct. 572, 574, 85 L.Ed. 859. 'An intelligent and full understanding by the accused of the charge against him is a first requirement of due process.' Bergen v. United States, 8 Cir., 145 F.2d 181, 187.

"Regardless of some ill-considered, loose expressions in some of the cases, the law is and always has been that it is not enough to charge against a defendant a mere legal conclusion as justly inferential from facts not set out in the indictment. United States v. Almeida, 24 Fed.Cas. pages 775, 776, No. 14,433.

" 'In order to properly inform the accused of the "nature and cause of the accusation," within the meaning of the constitution and of the rules of the common law, a little thought will make it plain, not only to the legal, but to all other educated, minds, that not only must all the elements of the offense be stated in the indictment, but that also they must be stated with clearness and certainty, and with a sufficient degree of particularity to identify the transaction to which the indictment relates as to place, persons, things, and other details. The accused must receive sufficient information to enable him to reasonably understand, not only the nature of the offense, *but the particular act or acts touching which he must be prepared with his proof; and when his liberty, and perhaps his life, are at stake, he is not to be left so scantily informed as to cause him to rest his defense upon the hypothesis that he is charged with a certain act or series of acts, with the hazard of being surprised by proofs on the part of the prosecution of an entirely different act or series of acts*, at least so far as such surprise can be avoided by reasonable particularity and fullness of description of the alleged offense.' (Italics supplied.) United States v. Potter, 1 Cir., 56 F. 83, 89."

Before leaving the indictment, we must note that "Alabama Forestry Association, a corporation" was named along with the other corporate defendants. The undisputed proof showed there was no such corporate entity. We have not found, nor have we been cited to, an Alabama case holding that an *association* can be indicted and convicted of a criminal offense.

In 7 C.J.S. Associations § 17, page 43, it is stated:

"Only individuals or corporations can be indicted and convicted of the commission of crimes, and an unincorporated association of persons denominated as trustees cannot be indicted and convicted of crime, since, if a crime is committed, it must be committed by them as individuals."

To the same effect are the following cases: *Edward Hines Yellow Pine Trustees et al. v. State*, 130 Miss. 348, 94 So 231; *Bridgeport v. Fraternal Order of Eagles*, 97 Ohio App. 245, 125 N.E.2d 202; *State v. Freemont Lodge of Loyal Order of Moose*, 151 Ohio St. 19, 84 N.E.2d 498.

This matter was raised before the trial judge by demurrer, plea of misnomer, motion to quash the indictment, and motion for acquittal. In the face of the uncontroverted evidence that the Alabama Forestry Association was not a legal entity subject to criminal prosecution, the trial judge summarily overruled the demurrer, denied

the plea of misnomer, the motion to quash and the motion for acquittal. The court fell into error again.

We turn now to the insistences by all appellants that they were victims of discriminatory prosecution in violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.

The Annual Sessions Amendment to be voted on at the General Election of 1972 stirred up much interest. A number of committees favoring the Amendment were formed in support of the proposal and conducted a vigorous campaign through newspaper advertising and by radio and television broadcasts.

A great number of individuals and citizens throughout the state, including the appellants, were vehemently opposed to the Amendment. Some of the individual appellants, but not all of them, met with the advertising firm of Luckie and Forney, Inc., of Birmingham, Alabama, to discuss the amount of money it would take to conduct a campaign in opposition to the proposed Amendment. The figure quoted by Mr. Forney was so high that it was then and there rejected and the advertising firm was requested to revise the figure downward by eliminating television broadcasts.

Subsequently a representative of Luckie and Forney came to Montgomery and met with a group of citizens at a local motel. Some, but not all, of the individual appellants, met with this group of citizens and the representative from Luckie and Forney. The money proposal made by the agent of the advertising firm was accepted at this meeting.

It was decided that a committee of citizens be organized through which opposition to the constitutional measure could be spearheaded. A committee was formed with Mr. James A. Watts, a retired army officer as chairman. The name of the committee, "Taxpayers Against Annual Sessions Committee", was suggested by Luckie and Forney, Inc. The committee

had no treasurer. This committee solicited no funds nor were any funds ever collected, but the chairman determined that any contributions to be made to the committee would be forwarded directly to the advertising firm of Luckie and Forney, Inc. to cover the cost of ads prepared by the firm which could be purchased by any individual or business association desiring to run such ads in the various newspapers published in the state in opposition to the proposed amendment.

There is not the slightest evidence in this record that any of the appellants, corporate or otherwise, ever became a member of the "Taxpayers Against Annual Sessions Committee".

However, the state, in brief and oral argument, contends that appellants were the *real committee* and that the committee organized with Mr. Watts as chairman was nothing more or less than a "sham" committee to act as a front for appellants in their efforts to defeat the amendment. This charge by the state is utterly without foundation and amounts to nothing more than an unwarranted conclusion which rests in surmise, conjecture and speculation. This unauthorized conclusion served the state's purpose in bringing about the indictment of all appellants in this case.

Appellants introduced in evidence as Exhibit No. 5 a list of committees formed under the provisions of Title 17, Section 268, Code of Alabama 1940. This list contained more than forty committees by name and they all ran political ads in various newspapers published in Alabama. Attached to this list is a certificate of Mabel S. Amos under the Great Seal of the State stating "that after a thorough search of the files in this office to the best of my knowledge and belief the committees listed on the attached pages have not filed expense accounts with the Secretary of State under the Corrupt Practices Act as of December 10, 1972."

To set forth the names of each of these committees would only serve to overextend

this opinion. We do deem it wise to set out some of the names of the committees failing to file:

1. Taxpayers Against Annual Sessions.

2. Huntsville League of Women Voters.

3. Citizens for Legislature Reform.

4. Constitutional Revision.

5. Committee to Elect Alabama Democrats.

6. League of Women Voters of Montgomery.

7. Alabama Constitutional Commission.

There were several other committees espousing the election of several prominent and outstanding candidates for public office who were elected and are now serving in their official capacities. We will omit the names of these committees.

Mrs. Amos, then Secretary of the State of Alabama, testified that she was the chief election officer of the state. Among the duties of her office she was custodian of all records filed pursuant to the Corrupt Practices Act. She further stated that her office had no record of any previous filing of statements by committees in opposition to or in favor of any proposals; that as a matter of fact the Secretary of State had no forms for filing by committees.

It is conceded by both sides that this is the first time in the history of the state that political committees formed for any purpose pursuant to the provision of Section 268 of Title 17, Code of Alabama 1940, and failing to file expense accounts with the Secretary of State, were ever indicted, tried and convicted. However, an indictment was returned against former State Senator James Clark. Senator Clark along with Melba Till Allen were co-chairmen of a committee "to elect Alabama Democrats". Mrs. Allen was not indicted. The indictment against Clark was returned at the second meeting of the Special Grand Jury.

The indictment against Clark is as follows:

"The Grand Jury of said County charge that, before the finding of this indictment, James S. Clark, whose name is to the Grand Jury otherwise unknown, was elected, appointed, chosen or associated for the purpose wholly or in part of directing the raising, collection or disbursement of money used or to be used to further or defeat the nomination or election of persons to public office by popular vote in the General Election of November, 1972, and did fail to file within thirty days after the General Election held in November of 1972, with the Secretary of State, a statement giving in itemized, detailed form, including names, items and detailed amounts, covering all of the expenditures made directly or indirectly, and all obligations debts or liabilities assumed or incurred at the time of filing of said statement, said statement which was further to include the names of all contributors of amounts in excess of ten dollars, with amount given by each, and a list of all gifts, loans and contributions made, such statement which was further to itemize all monies, expended in sums over five dollars giving the names of various persons to whom such moneys were paid, the specific nature of each item, by whom the service was performed, and purpose for which it was expended, such statement which was further to have had an affidavit attached, subscribed and sworn to by the said James S. Clark setting forth in substance that the statement thus made is in all respects true, and that the same is a full and detailed statement of all moneys, securities or equivalents of money coming under his control or custody and by him expended directly or indirectly, contrary to law against the peace and dignity of the State of Alabama."

The Assistant Attorney General in charge of the prosecution of all defendants indicted under the Corrupt Practices Act

appeared before Honorable David W. Crosland, Circuit Judge of Montgomery, and moved that the indictment against Clark be nol prossed on the ground that there was *no willful or intentional acts* on his part for failing to file an expense account. Attached to amended motions for a new trial filed by all appellants is the following affidavit of Judge Crosland to which was attached to the indictment as Exhibit "A":

"BEFORE ME, Ruth M. Jackson, a Notary Public in and for said State and County, personally appeared D. W. Crosland, to me known, who being by me first duly sworn on oath deposes and says:

"My name is D. W. Crosland, Circuit Court Judge, Fifteenth Judicial Circuit, Circuit Court of Montgomery County, Alabama; that on the 19 day of February, 1974, at the regular call of the Criminal Docket, I was sitting as Judge of the Criminal Division; that the case of the State of Alabama vs. James Clark, Case Number 8971 was called at that time; that said defendant was charged with a violation of Title 17 Section 268, et seq. Code of Alabama 1940, as more fully appears from the said indictment, a true and correct copy of which is attached hereto as Exhibit 'A'; that at said time and place and in connection with said indictment, Assistant Attorney General William Stephens, who was in charge of the prosecution of said case, recommended in open Court that said indictment and each count thereof, be nol prossed on the basis that after investigation by the Attorney General's office they were of the opinion that although the defendant, James Clark, might be guilty of a technical violation of the charges in the indictment, the Attorney General's office was of the opinion that the violation of the Corrupt Practices Act as charged in the indictment against the defendant was neither wilful nor intentional on his part; that

upon the representations and recommendations of Assistant Attorney General Stephens, the indictment and each count thereof was nol prossed.

"s/ D. W. Crosland
    D. W. Crosland

"SWORN to and subscribed before me this 14th day of March, 1974.

"s/ Ruth M. Jackson
    Notary Public"

██ It thus appears that the prosecution realized that violations of the Corrupt Practices Act must be "willful and intentional" and must be so charged in indictments brought under said Act.

The evidence reflects that the six defendant associations by the very nature of their organization share a common concern for the welfare of their membership which is evidenced, in part, through lobbying efforts and the monitoring of legislative programs of the State Legislature. The defendant associations, as well as similar organizations, not parties to this prosecution, would meet occasionally, through their executive personnel, to discuss legislative matters of common interest to all. The tendencies of the evidence show that in the late summer and early fall of 1972, three or four meetings transpired at which one topic of discussion, among others, was the recently proposed constitutional amendment allowing annual sessions of the Legislature which was to be submitted to the voters at the General Election of November of 1972. Some of the defendant organizations and individuals attended each of these meetings while others attended only one or two, the testimony of the actual attendances being highly uncertain and in many instances purely speculative. Also in attendance were representatives of businesses and associations such as the United States Steel Corporation, the Alabama Power Company, and the Alabama Petroleum Council, and others who were not indicted by the Special Grand Jury.

Mrs. Ann Waldo testified that she was a member of the Special Grand Jury which returned the indictment against the defendants and at that time she was a member of the League of Women Voters of Montgomery. She further testified that the Montgomery League took an active part in campaigning in favor of the constitutional amendment on annual sessions. She identified written material prepared and published by the League of Women Voters of Alabama urging support of the constitutional amendment which was distributed in the Montgomery area by the Montgomery League at their expense. Mrs. Waldo further stated that the Montgomery League did not file a statement of campaign expenditures with the Secretary of State, and, indeed, when a member of the League inquired of the Secretary of State whether such a filing was required, she was advised that no forms for filing were available and was completely discouraged in filing a statement. Of course, the League of Women Voters was not indicted.

It is well to note here that neither the chairman of the "Taxpayers Against Annual Sessions" nor any of its members were indicted by the Special Grand Jury though they were well known to the prosecution and several of the members testified in this case.

The "Citizens for Legislature Reform" was a committee composed of the five-member House delegation from Montgomery County, who ran ads strongly advocating the ratification of the annual sessions amendment. This committee failed to comply with the Corrupt Practices Law by not filing with the Secretary of State a statement showing expenditures. They, too, were not indicted.

There was not a scintilla, tittle or thread of substantial or creditable evidence tending to show that appellants were members of the "Taxpayers Against Annual Sessions Committee, James A. Watts, Chairman, Luverne, Alabama."

It is true that Associated Industries of Alabama paid Luckie and Forney, Inc.,

$16,600.00 by checks and that Mr. Gilbert Mobley, Executive Vice-President of Associated Industries paid the advertising firm $3,000.00 in cash. The Alabama State Chamber of Commerce sent Luckie and Forney a check for $5,000.00, and Alabama Textile Manufactures sent a check for $1,500.00.

It is undisputed that the Alabama Farm Bureau Federation, the Alabama Trucking Association, and the Alabama Forestry Association did not contribute any money to Luckie and Forney, Inc. There is absolutely no evidence that any of the other individual defendants contributed any money or other thing of value to Luckie and Forney, Inc.

Notwithstanding the prosecution knew that numerous committees were formed and actively supported various candidates in the General Election of 1972, and actively *supported* and *opposed* measures and causes during that election year, the prosecution consciously and knowingly let these committees "go by the board." They decided to bring up their heavy artillery and zero in on these appellants in an effort to hinge a conviction so that they would have to wear the stigmatism of violating the Corrupt Practices Law of Alabama.

In the view we take of this case, these appellants, corporate and otherwise, had done nothing more or less than exercise their First Amendment rights of free expression to speak out against a cause they conscientiously felt was detrimental to the best interest of the citizens of this state.

In *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220, the Supreme Court said:

"Though the law itself be fair on its face and impartial in appearance, yet, if it be applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is

still within the prohibition of the Constitution."

In *East Coast Lumber Terminal v. Town of Babylon,* 2 Cir., 174 F.2d 106, Judge Learned Hand wrote: "It has indeed been the law for over sixty years that the (14) Amendment covers the unequal enforcement of valid laws, as well as any enforcement of invalid laws," *Yick Wo v. Hopkins, supra.*

In *Sunday Lake Iron Co. v. Wakefield,* 247 U.S. 350–352, 38 S.Ct. 495, 62 L.Ed. 1154, the Supreme Court said: "The purpose of the equal protection clause of the Fourteenth Amendment is to secure to every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents."

In *Griffin v. Illinois,* 351 U.S. 12, 76 S. Ct. 585, 100 L.Ed. 891, the Supreme Court held, "A law nondiscriminatory on its face may be grossly discriminatory in its operation."

▋ A defendant cannot be convicted if he proves an unconstitutional discrimination in the administration of a penal statute. A case squarely in point is *United States v. Steele,* 9 Cir., 461 F.2d 1148, wherein the Court said:

"The government offered no explanation for its selection of defendants, other than prosecutorial discretion. That answer simply will not suffice in the circumstances of this case. Since Steele had presented evidence which created a strong inference of discriminatory prosecution, the government was required to explain it away, if possible, by showing the selection process actually rested upon some valid ground. Mere random selection would suffice, since the government is not obligated to prosecute all offenders, but no effort was made to justify these prosecutions as the result of random selection and Steele's evidence was inconsistent with such a theory. Since no valid basis for the selection of defendants was ever presented, the only plausible explanation on this record is the one urged by Steele. We conclude that Steele demonstrated a purposeful discrimination by census authorities against those who had publicly expressed their opinions about the census."

For an excellent annotation on the subject discriminatory enforcement of penal laws see 4 A.L.R.3d page 404.

In the case of *Simonetti v. City of Birmingham,* Ala.App., 314 So.2d 83, released by this Court on February 6, 1975, in treating a similar problem involving a discriminatory enforcement of a penal ordinance, we said:

"We believe that if the law, all laws, is *enforced equally* and *justice is dispensed with an even hand,* and on a nondiscriminatory basis, all citizens will maintain a high regard and a lofty respect for our Court system as administered under the Constitution. If it can't be done in this fashion, then it must not be done at all."

▋ On this multi-volume record before us, we conclude that appellants were grossly discriminated against in the attempted enforcement of the Corrupt Practices Law of this state and were denied the rights guaranteed to each of them under the Equal Protection Clause of the Fourteenth Amendment.

As the Supreme Court of the United States said in *In re Winship,* 397 U.S. 358 at 365, 90 S.Ct. 1068 at 1073, 25 L.Ed.2d 368, 376, "Civil labels and good intentions do not themselves obviate the need for criminal due process safeguards."

There is yet another reason, perhaps more compelling, why these convictions must not be allowed to stand and this is grounded on the actions of the trial judge.

The trial of appellants was begun on December 6, 1973, and concluded on December 7. Immediately upon the conclusion of the case each defendant filed a written motion for a directed verdict of not guilty un-

der both counts of the indictment. In support of these motions for acquittal the defendants alleged, among other things that (1) there was an absence of sufficient evidence to warrant a conviction, (2) the state failed to prove facts sufficient to constitute a prima facie case, (3) the state failed to prove any criminal intent or willful violation of the Corrupt Practices Act, (4) the state failed to connect the defendants with the offenses alleged in the indictment, and (5) the defendants were subjected to the discriminatory enforcement of a penal statute. Instead of ruling on the motions for acquittal, the court took the cases under advisement.

Subsequent to the indictment and prior to ruling on any of the pleadings filed in the case, and prior to the trial of the case, the trial judge made all the defendants and their counsel the following proposition and proposed the following "Bench Note":

"The Court is joined by the Attorney General and each named defendant in these observations.

"The foundation of responsible democratic government should be a strong campaign financing and election practice system.

"All the parties here involved acknowledge that the existing campaign financing and election practice system of this state at all levels of government is in need of major reform.

"Furthermore, the Court takes judicial notice of the fact and the parties acknowledge that the existing laws and regulations in this area have been repeatedly and flagrantly violated in every election conducted during the past few decades including the election in question here. These are hereby acknowledged by the parties.

"All involved with the matter before this Court express deep concern with the conditions which exist in this state pertaining to campaign financing and election practices.

"Every association named here has agreed to use this incident as sufficient reason to band together as a committee to exert every possible influence available to bring about this needed meaningful reform in this area in Alabama. In this regard, they pledge the considerable resources of their respective associations to this end. They hereby represent that each will undertake to educate their separate memberships and the general public of the many present deficiencies in the laws concerning these areas within this state and of the many abuses being practiced presently. All pledge to work unceasingly for the passage of the attached legislation during every special and every regular session of the state legislature. Assistance from other groups and individuals will be solicited. Additionally, a study of the possible need of other legislation in this field will be undertaken by this group and if it is shown to be needed, efforts at its passage will likewise be made.

"Solely for the purpose of establishing one association as the one responsible for calling this group together and serving as the general directing agency, the Court names the Alabama State Chamber of Commerce as that association and agency.

"This case, in light of these observations, is hereby continued generally by the Court with the understanding that if the compliance with the above is fullhearted, substantial and genuine, *this case will be dismissed at the appropriate time.*

"The Court alone makes the following observations. This course of action in the handling of this matter is not at the suggestion of any defendants or the Attorney General. It is completely at the initiative of the Court hence no criticism should be directed toward the parties or the Attorney General. The offenses charged in the indictment are misdemeanors and carry with them at the maximum only mild punishment.

"On the other hand, the abuses in campaign financing are so deep and so widespread that they serve as the beginning of all corruption, favoritism and dishonesty in government.

"Therefore, if the parties here and if the incident here can serve as a combining force to help correct these very detrimental practices, then this unusual method of handling this case will see the ends of justice met and will be of benefit to the people of this state." (Emphasis supplied).

.     .     .     .     .     .

"EXHIBIT 'B'

"BENCH NOTE

"In this case, the Court is called upon to apply a law which was written in 1915 and which, since then, has not been in any substantial way modified or modernized.

"The purpose and intent of this law is to control a most important aspect of a democratic society which is the financing of political campaigns and the supervision of election practices.

"Even from the beginning of the application of this law in 1915, confusion has existed due to the vagueness of the language used in the law.

"Additionally, due to the fact that this law has not been brought up to date during the past 60 years, the application of this law becomes even more difficult.

"For examples of the above difficulty, in the election process of today the use of radio and television in political campaigning and in deciding elections of public officals has become extremely important and critical. In spite of these developments, none of this use is adequately governed by the election practices and campaign financing law of the State. Of course, this is due to the fact that commercial radio and television were not in use in 1915.

"Even newspaper advertising in campaign practices has undergone radical change during these 60 years in the election process, yet it is not adequately covered by this 1915 law.

"Other examples of the inadequateness of this law can easily be cited.

"All this points up the pressing need for legislative attention in this field.

"The key lesson to be learned from the evidence presented in this entire proceeding points up this pressing need.

"If, as a result of the presentation of this evidence, the public is made aware of this need, then much has been accomplished.

"Furthermore, if this Court does no more than merely make the narrow interpretation of whether or not this law has been violated, there is little likelihood that complete justice will be served in the sense that the public will benefit.

"All involved with the matter before this Court express deep concern with the conditions which exist in this state pertaining to campaign financing and election practices.

"Every party named here is either a concerned citizen or a responsible association and has agreed to use this incident as sufficient reason to band together as a committee to exert every possible influence available to bring about this needed meaningful reform in this area in Alabama. In this regard, they pledge the considerable resources of their respective associations to this end. They hereby represent that each will undertake to educate their separate memberships and the general public of the many present deficiencies in the laws concerning these areas within this state and of the many abuses being practiced. All pledge to work unceasingly for the passage of the attached legislation during the next regular session of the state legislature. Assistance from other groups and individuals will be solicited.

"This case, in light of these observations, is hereby continued under advise-

ment with the understanding that after these parties have had an opportunity to comply with the aforesaid representations, the case will be disposed of by the Court.

"This course of action in handling this matter is not at the suggestion of any defendants or the Attorney General. It is solely at the initiative of the Court and in no way should be considered a detrimental admission by any of the parties involved."

The Election Reform Bill proposed by the Court, and which each defendant was required to support and obtain its enactment in exchange for a *dismissal of the indictment,* was a bill probably prepared by "Common Cause" of Washington, D. C. This bill covers twelve (12) pages of the transcript. It would serve no useful purpose to make it an "appendix" to this opinion.

Suffice it to say that the proposed bill would completely re-structure the whole election process in Alabama. The criminal sanctions alone would cause the average citizen to recoil from lending support to such a bill.

Section 23 provides that any person who violates thirteen (13) provisions of such proposed law is "guilty of a misdemeanor and shall be fined not more than $1,000.00 if an individual, and not more than $5,000.-00 if a person other than an individual, or imprisoned for not more than one year, or be both fined and imprisoned."

A person other than an individual would have to include partnerships, associations and corporations. It would be an interesting innovation in the law to learn how a corporation may be imprisoned.

This proposed bill also would appropriate out of the General Fund of the State Treasury the sum of $100,000.00 for each of the next two state fiscal years to the state elections commission created by the proposed law. In this day of spiralling inflation, which some economic experts claim

also to be the brink of a deep recession, this proposed bill would have no more chance of passage than the "proverbial snowball". No matter how earnest and diligent appellants worked for the enactment of the bill, the trial judge wanted passed by the Legislature, these appellants would be living under a hovering threat that their efforts were not good enough and they would be at the mercy of the trial court and would be convicted anyway.

All appellants, through their respective counsel, rejected the proposal made by the trial court and requested a fair and impartial trial on the merits.

After conviction all appellants filed motions for a new trial alleging as error all of the adverse rulings of the trial court on all the pleadings, demurrers, motions to quash, motions to suppress, pleas in abatement, motions for acquittal, and the sufficiency of the evidence. To all motions for a new trial, counsel representing each defendant signed a joint affidavit in words and figures as follows:

"STATE OF ALABAMA

MONTGOMERY COUNTY

"BEFORE me, Marcia Varner, a Notary Public in and for said County and State personally appeared Warren Goodwyn, Robert A. Huffaker, Charles Stakely, Richard Belser, William I. ·Hill, II and Harry Cole, who being by me first duly sworn deposed on oath and said as follows:

"1. That the undersigned are attorneys of record for Associated Industries of Alabama, Inc., a Corporation, Alabama Farm Bureau Federation, a Corporation, Alabama State Chamber of Commerce, a Corporation, Alabama Trucking Association, Inc., a Corporation, Alabama Forestry Association, an unincorporated association that was not indicted and Alabama Textile Manufacturers Association, Inc., a Corporation, Gilbert Mobley, Milton Parsons, Thomas Eden, Joe W. Graham and James I. Ritchie, that the

undersigned represented the respective parties in the prosecution by the State of Alabama in the above entitled case.

"2. That subsequent to the indictment and prior to the trial of the case, and prior to any rulings on any pleadings or motions, the trial judge, Honorable Richard P. Emmet, delivered to attorneys for the defendants the attached document marked Exhibit 'A' which said document was a proposed statement or judgment entry to be entered by the trial court upon agreement of the defendants to support certain legislation which the trial judge personally wished to have sponsored in the next session of the Alabama Legislature, that after delivery of said document the trial judge called the affiants and their respective clients to a meeting and reiterated his proposal and that after discussion and deliberation the defendants declined to enter into such an agreement.

"3. The Court heard the testimony in said case on December 6, 1973 and 7, 1973 at which time the defendants reoffered all previous testimony in evidence on the merits which had been offered in preliminary hearings and the Court accepted same, and then took the said case under submission on the merits.

"4. On or about December 17, 1973, the Court again summoned affiants, counsel for all the defendants, to his chambers and delivered to them a proposed bench note and attached proposed legislation, a copy of which is attached hereto as Exhibit 'B' and told each of the affiants that the said proposed bench note should be delivered to their clients for their consideration and that he should be advised of their reply with regard to acceptance of same no later than noon, December 27, 1973.

"5. That all of the defendants in said case, through their counsel, the affiants, notified the trial judge by December 21, 1973, that they could not consent to such a proposed bench note or judgment entry

and attached legislation, because they did not agree with all of the legislation, contained in said bill, that their respective organizations could not undertake to support such legislation, that the defendants did not consider that they had violated any law and their only interest in the case was to have a fair and impartial decision based upon the evidence in the case and the law applicable thereto.

"6. Upon receipt of the replies of defendants, the trial judge notified all of the parties to be present in open Court on December 26, 1973, the next day which court was to be in session following notification by defendants of their rejection of the Court's proposal, and that on December 26, 1973, the Court found all of the defendants guilty and imposed the maximun fine allowed by law.

"s/Warren Goodwyn
s/Robert A. Huffaker
s/Charles Stakely
s/Richard Belser
s/William I. Hill, II
s/Harry Cole

"SWORN to and subscribed before me this 27 day of December, 1973.

"s/Marcia Varner
Notary Public"

The "exhibits" referred to in the affidavit were the statements made by the trial court to appellants and their counsel and the "Bench Note" heretofore quoted on pages 892 and 893 of this opinion and will not be again repeated.

We conclude from the actions of the trial judge in this case that he abdicated his judicial functions as a fair and impartial arbiter and entered the arena as a political activist and attempted to use his high office to persuade these appellants into working for a piece of reform legislation that he avowedly wanted enacted into law.

As the Supreme Court of the United States said in *Ross v. Oregon,* 227 U.S.

150, 33 S.Ct. 220, 57 L.Ed. 458, "A judicial inquiry investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed to already exist. *This is its purpose and end.* Legislation, on the other hand, looks to the future, and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power." (Emphasis supplied)

In *Ex parte White, Jr.,* 53 Ala.App. 377, 300 So.2d 420, certiorari denied, 293 Ala. 778, 300 So.2d 439, this Court said:

"In the English-speaking countries of the world there exists a well-recognized principle of law that every individual charged with the commission of a crime or misdemeanor shall, upon being charged and made to answer, be accorded a fair and impartial trial.

"This rule is basic in the Constitution of our United States and is also found in Article 1, Section 6, of the Alabama Constitution, 1901.

"Courts of last resort throughout the United States, over and over, have given emphasis to the importance of observing this principle as the surest means to guarantee fair and just enforcement of the law."

Further quoting from *White, supra,*

"On this subject, State v. Aldridge, 212 Ala. 660, 103 So. 835, quoted approvingly this language from Moses v. Julian, 45 N.H. 52, 54, 84 Am.Dec. 118:

" ' "It is the right of every citizen to be tried by judges as impartial as the lot of humanity will admit." This is but the expression of a well-known rule of universal justice everywhere recognized * * *. It is one of the great principles of the common law, for which the people of England had struggled for ages, and which they ultimately succeeded in establishing against the strenuous efforts of a tyrannical government.

We can have no higher authority than this for denouncing as illegal everything which interferes with the entire impartiality of every legal tribunal.'

"The Supreme Court of the United States has many times in the history of our country written pronouncements concerning the requirements of due process and in the recent case of In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942, it concluded that a fair trial in a fair tribunal is a basic due process requirement. Further, the court stated:

" 'Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that "Every procedure which would offer a possible temptation to the average man as a judge * * * not to hold the balance nice, clear, and true between the State and the accused denies the latter due process of law." Tumey v. State of Ohio, 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749. Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way "justice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11.'

"[2] Implanted in the foundation of public policy is the general rule that no judge shall preside in a case in which he is not wholly free, disinterested, and in-

dependent. Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749."

In *Ex parte Cornwell*, 144 Ala. 497, 39 So. 354, the Supreme Court said:

"In Gill v. State, 61 Ala. [169], 172, it was said: 'According to the stern morality of the common law, a judge is required to be legally indifferent between the parties.' In Freeman on Judgments, § 145, it is said to be 'well settled by the common law that no judge ought to act where, from interest *or any other cause,* he is supposed to be partial to one of the suitors.' Any interest, the probable and natural tendency of which is to create a bias in the mind of the judge for or against a party to the suit, is sufficient to disqualify." (Emphasis supplied)

Appellants earnestly contend that the trial judge's actions in seeking to inject his office into the legislative functions violates the principles of separation of powers and indicates a bias or preconceived opinion in the mind of the judge against the appellants. They further contend the conduct by the trial court illustrates the court's fixed opinion and demonstrates that the finding of guilt against the appellants was strongly influenced by their refusal to support the legislative bill favored by the trial judge.

The state answers these contentions by saying (1) appellants did not move for a recusal (and upon his refusal to disqualify himself, to file a petition for Writ of Mandamus), and (2) that the trial court was dealing in only ancillary matters foreign to the merits of the case. The state further claims that by failing to seek a recusal these appellants waived any rights they may have had to complain about the actions and activities of the trial judge.

██ We recognize that there are many constitutional rights that an accused charged with a criminal offense may expressly waive provided such waiver is understandingly, knowingly and intelligently made. He can waive his rights to a public trial by a jury of his peers, his right to counsel, his right against self-incrimination, and his right to be confronted by his accusers, etc.

██ However, these appellants made it plain at the outset that they wanted a "bench" trial and not a jury trial. This they had a right to do. We do not know of any case in the land that when an accused elects to go to trial in an effort to prove his innocence he thereby *waives his right to a fair and impartial trial before a fair and impartial tribunal,* be that tribunal a judge or a jury. To so hold offends every concept of the American sense of justice.

██ When the trial judge took the case under advisement and ten days later called the defendants and counsel before him and put the proposition to them a *second time* that if they would support the legislation he favored the cases would be dismissed, it is fair to conclude that he was not convinced beyond a reasonable doubt and to a moral certainty that they were guilty as charged in the indictment. He should have granted appellants' motions for acquittals under each count of the indictment then and there. When the trial judge was rebuffed the second time he ordered all defendants to appear before him on December 26, 1973 (one day before scheduled) and found each guilty and assessed the maximum fine of $500.00 against each of them.

The conduct of the trial judge in the manner in which he approached a disposition of these cases demonstrates that he was trifling with the rights and liberties of these appellants and such conduct is shocking to the judicial conscience of this Court. This second overture compounded the wrong already committed. To allow these convictions to stand would be a grave miscarriage of justice and would be wrong and unjust.

██ In reviewing appeals under the provisions of Title 15, Section 322, Code of

Alabama 1940, that is to say, where the cases are tried by the court without a jury, this Court shall review the same, on appeal, without any presumption in favor of the Court below either on the rulings on the law or conclusions on the evidence, and, if there be error, shall render such judgment in the cause as the Court below should have rendered. *Jaye v. State*, 23 Ala.App. 391, 127 So. 244.

Having determined that these convictions cannot be permitted to stand it is the order of this Court that the judgment of conviction is reversed, the indictment is dismissed, and appellants are discharged from further prosecution.

Reversed and rendered.

All the Judges concur in the judgment.*

DeCARLO and HARALSON, JJ., concur in full.

CLARK, J., concurs specially.

MOORE, J., concurs in the result and dissents in part.

CLARK, Judge (concurring specially):

Implicit in those cases wherein unconstitutionally discriminatory prosecution is found, there is an element of actual or potential coercion. Whatever crime was committed in those cases was still *in praesenti* and was calculated to be also *in futuro*. It was not merely the matter of a person's or persons' committing a crime of a nonrepetitive or noncontinuous nature.

A major vice to be found in discriminatory prosecution is in its coercive power,

the Damoclean "cease and desist or else." This is vivified in cases in which injunctive relief has been sought to prevent such prosecutions.

The alleged criminal conduct here involved is, and was at the time of the institution of the prosecution, a thing of the past exclusively. Whatever committee was formed was no longer viable. The members thereof could be punished for whatever crime they committed, but it is inconceivable that a prosecution of them would tend to curb them even in a similar activity in the future any more than it would others.

There is no contention by defendants that anyone had it in for them by reason of who they are. To the contrary their prestigiousness is beyond question and the near unanimity of esteem they enjoy is beyond cavil. A less likely target of discrimination, in its derogatory sense, could hardly be found.

The claim is that the alleged discriminatory conduct is to be seen by the light of the particular objective, an objective that had been accomplished before the prosecution commenced. The anomaly that it now appears that there may be in the near future another election on the same subject does not discount in the least the reality that such was not reasonably foreseeable at the time of the institution of the prosecution, or even at the time of the submission of this case on appeal. No such contention is to be found in the briefs or oral arguments of any of the parties.

There is no evidence to the effect that the flesh and blood and spirit that activated the prosecution of defendants had views in opposition to the defendants on the sub-

---

* Presiding Judge AUBREY M. CATES, Jr., Judge JOHN C. TYSON, III, and Judge JOHN G. BOOKOUT, having recused themselves, Supernumerary Judges LEIGH M. CLARK, W. J. HARALSON, and L. S. MOORE were appointed by Chief Justice HEFLIN to consider and decide the appeal of Associated Industries of Alabama, Inc.; Ala-

bama Farm Bureau Federation; Alabama Trucking Association; Alabama Textile Manufacturers Assn.; Alabama State Chamber of Commerce; Alabama Forestry Assn.; Joe W. Graham; James I. Ritchie; Thomas Eden; Gilbert Mobley; Milton Parsons v. State of Alabama.

ject of the proposed constitutional amendment. There is no evidence that anyone acting on the opposite side of the question was a party to the institution of the prosecution. The result of the election shows prima facie at least that the defendants were on the popular side. Discrimination against entrenched popularity is possible, but it is rare; if true, it partakes of the nature of a paradox. If it exists in this case, it constitutes an enigma that has not been explained, a riddle that has not been solved.

Although I concur in the judgment of reversal and rendition on other points in the opinion, I fail to see improper or unconstitutional discrimination, by whatever characterization it is given, such as "invidious discrimination", prosecution "with an evil eye and an uneven hand", "purposeful" discrimination, and discrimination based upon "unjustifiable standard such as race, religion, or other arbitrary classification", in cases cited in the prevailing opinion in this case.

MOORE, Judge (concurring in the result of the majority opinion and dissenting in part):

I concur in the majority opinion written by Judge Harris in reversing this case because of the error of the trial judge in overruling the demurrer to the indictment and each count thereof. The indictment was subject to said demurrer on the grounds stated in said opinion.

I concur in said majority opinion in reversing and rendering this case on the action and failure to act on the part of the trial judge as set out in said opinion and with all statements of said opinion in connection therewith.

I respectfully dissent as to that part of the majority opinion which reverses and renders this case on the basis of "so called" discriminatory prosecution.

The fact that state courts are bound by the interpretation of the Constitution of the United States by the Supreme Court of the United States has been repeated so often that it requires no citation of authority. The Supreme Court of the United States has stated its interpretation of the point in question in the case of *Oyler v. Boles,* 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 in these words:

"Petitioners also claim they were denied the equal protection of the law guaranteed by the Fourteenth Amendment. In his petition for a writ of habeas corpus to the Supreme Court of Appeals of West Virginia, Oyler stated:

'Petitioner was discriminated against as an Habitual Criminal in that from January, 1940, to June, 1955, there were six men sentenced in the Taylor County Circuit Court who were subject to prosecution as Habitual Offenders, Petitioner was the only man thus sentenced during this period. It is a matter of record that the five men who were not prosecuted as Habitual Criminals during this period, all had three or more felony convictions and sentences as adults, and Petitioner's former convictions were a result of Juvenile Court actions.

\*　\*　\*　\*　\*　\*

'#5. The Petitioner was discriminated against by selective use of a mandatory State Statute, in that 904 men who were known offenders throughout the State of West Virginia were not sentenced as required by the mandatory Statutes, Chapter 61, Article 11, Sections 18 and 19 of the Code. Equal Protection and Equal Justice was [sic] denied.'

"Statistical data based on prison records were appended to the petition to support the latter allegation. Crabtree in his petition included similar statistical support and alleged:

'The said Statute are [sic] administered and applied in such a manner as to be in violation of Equal Protection and Equal Justice therefore in conflict

with the Fourteenth Amendment to the Constitution of the United States.'

"[7] Thus petitioners' contention is that the habitual criminal statute imposes a mandatory duty on the prosecuting authorities to seek the severer penalty against all persons coming within the statutory standards but that it is done only in a minority of cases. This, petitioners argue, denies equal protection to those persons against whom the heavier penalty is enforced. We note that it is not stated whether the failure to proceed against other three-time offenders was due to lack of knowledge of the prior offenses on the part of the prosecutors or was the result of a deliberate policy of proceeding only in a certain class of cases or against specific persons. The statistics merely show that according to penitentiary records a high percentage of those subject to the law have not been proceeded against. There is no indication that these records of previous convictions, which may not have been compiled until after the three-time offenders had reached the penitentiary, were available to the prosecutors. Hence the allegations set out no more than a failure to prosecute others because of a lack of knowledge of their prior offenses. This does not deny equal protection due petitioners under the Fourteenth Amendment. See Sanders v. Waters, 199 F.2d 317 (C.A. 10th Cir. 1952); Oregon v. Hicks, 213 Or. 619, 325 P.2d 794 (1958).

"[8] Moreover, the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation. Even though the statistics in this case might imply a policy of selective enforcement, it was not stated that the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification. Therefore grounds supporting a finding of a denial of equal protection were not alleged. Oregon v. Hicks, supra; cf. Snowden v. Hughes, 321 U.S. 1, 64 S.Ct.

397, 88 L.Ed. 497 (1944); Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (by implication)."

The U. S. Supreme Court in *Snowden v. Hughes,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497, stated the rule as follows:

"[6] The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination. This may appear on the face of the action taken with respect to a particular class or persons, cf. McFarland v. American Sugar Refining Co., 241 U.S. 79, 86, 87, 36 S.Ct. 498, 501, 60 L.Ed. 899, or it may only be shown by extrinsic evidence showing a discriminatory design to favor one individual or class over another not to be inferred from the action itself, Yick Wo v. Hopkins, 118 U.S. 356, 373, 374, 6 S.Ct. 1064, 1072, 1073, 30 L.Ed. 220. But a discriminatory purpose is not presumed, Tarrance v. State of Florida, 188 U.S. 519, 520, 23 S.Ct. 402, 403, 47 L.Ed. 572; there must be a showing of 'clear and intentional discrimination', Gundling v. City of Chicago, 177 U.S. 183, 186, 20 S.Ct. 633, 635, 44 L.Ed. 725; see Ah Sin v. Wittman, 198 U.S. 500, 507, 508, 25 S.Ct. 756, 758, 759, 49 L.Ed. 1142; Bailey v. State of Alabama, 219 U.S. 219, 231, 31 S.Ct. 145, 147, 55 L.Ed. 191.
* * *

"[7] The lack of any allegations in the complaint here, tending to show a purposeful discrimination between persons or classes of persons is not supplied by the opprobrious epithets 'willful' and 'malicious' applied to the Board's failure to certify petitioner as a successful candidate, or by characterizing that failure as an unequal, unjust, and oppressive administration of the laws of Illinois. These epithets disclose nothing as to the purpose or consequence of the failure to certify, other than that petitioner has

been deprived of the nomination and election, and therefore add nothing to the bare fact of an intentional deprivation of petitioner's right to be certified to a nomination to which no other has been certified. Cf. United States v. Illinois Cent. R. Co., 303 U.S. 239, 243, 58 S.Ct. 533, 535, 82 L.Ed. 773. So far as appears the Board's failure to certify petitioner was unaffected by and unrelated to the certification of any other nominee. Such allegations are insufficient under our decisions to raise any issue of equal protection of the laws or to call upon a federal court to try questions of state law in order to discover a purposeful discrimination in the administration of the laws of Illinois which is not alleged. Indeed on the allegations of the complaint, the one Republican nominee certified by the Board was entitled to be certified as the nominee receiving the highest number of votes, and the Board's failure to certify petitioner, so far as appears, was unaffected by and unrelated to the certification of the other, successful nominee. While the failure to certify petitioner for one nomination and the certification of another for a different nomination may have involved a violation of state law, we fail to see in this a denial of the equal protection of the laws more than if the Illinois statutes themselves had provided that one candidate should be certified and no other."

No such clear and intentional discrimination is shown in the case before us. That which may have been known at the time of trial or learned from the testimony of witness at the trial is not shown to have been known at the time of the indictment. If there was any negligence (which is not shown) on the part of the prosecution to ascertain the activities and the names of all committees having anything to do with the adoption or rejection to the constitutional amendment by a vote of the people, that would fall short of showing that any selectivity that may have been made in this case "was deliberately based upon an un-justifiable standard such as race, religion, or other arbitrary classification" nor would not show "a purposeful discrimination".

The majority opinion reverses this case because the indictment *does not allege a willful failure to file a statement or to sign the advertisements.* The evidence does not show that the committees who were not prosecuted willfully failed to file such a statement. They are thus not presented as persons or committees who should have been prosecuted or had violated any law. One of the groups made an effort to ascertain if the filing of such a statement was required. If that shows anything it shows there was not a willful failure. If the committees mentioned in the majority opinion were not guilty of violating the act they should not have been prosecuted. Therefore, the fact they were not prosecuted is no evidence the prosecution of the defendants was discriminatory.

It is this writer's opinion there is no factual or legal basis to reverse and render this case on the grounds of discriminatory prosecution. Courts should proceed with great caution to reverse cases on such grounds. The effect of the majority opinion relating to discriminatory prosecution is to bring about a judicial repeal of the Corrupt Practice Act in question. Thus, leaving the people without its protection in the conduct of election. Even if the State Legislature enacted a new statute on the subject, the State would still be dependent on the help and mercy of a Federal Court for the District of Columbia or the Attorney General of the United States for the new act would have to be approved by one or the other. Federal Voter Right Act, 42 U.S.C.A. Sec. 1973c, page 138.

Further it is unnecessary for this Court to write upon the matter of discriminatory prosecution. This issue neither denies or confesses the guilt of the defendants. If this case was reversed and rendered solely upon that ground, there would be no clear adjudication of innocence. It is the opinion of this writer that defendants legally

**300**

are entitled to such an adjudication. In reversing and rendering this case on the action of the trial judge, the defendants have an adjudication of not guilty. The writer of this opinion concurs in that adjudication. The defendants should have received from the trial court a judgment of not guilty. Since they did not they were each denied a constitutionally fair trial. However, there was not a discriminatory prosecution of them in violation of their constitutional rights in that respect.

Because of membership in some of the appellant organizations, CATES, P. J., and TYSON and BOOKOUT, JJ., have recused themselves, and did not participate in the consideration or decision in this cause. Canon 3C, Canons of Judicial Ethics, American Bar Association.

CATES, P. J., and TYSON, J., were additionally disqualified under subsection (1)(d)(i) of Canon C of ABA Canons of Judicial Ethics (Code of Judicial Conduct), 1972.